CLEVELAND CREATIVE ARTS GUILD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cleveland Creative Arts Guild v. Comm'r
Docket No. 25281-83X. United States Tax Court
T.C. Memo 1985-316; 1985 Tax Ct. Memo LEXIS 310; 50 T.C.M. (CCH) 272; T.C.M. (RIA) 85316; July 1, 1985. *310 Petitioner, a non-profit corporation under Tennessee law, was organized for the purpose of promoting the arts. Petitioner sponsors a broad range of activities, including seasonal art festivals and craft shows. Participation in the festivals and shows is generally not restricted to members, and exhibitors have included non-members as well as members. The spring art festival features an art competition. Sales by the artists and craftsmen are a feature of all of the festivals and shows. Petitioner retains 10 percent of the sales proceeds to defray the expenses of operating the shows and festivals. Held: (1) Petitioner qualifies as an exempt organization under section 501(c)(3), I.R.C. 1954, as amended, because it is operated exclusively for the exempt purpose of promoting the arts. The art festivals and craft shows conducted by petitioner serve the exempt purpose of art education and any sales activities in connection with the festivals and shows are secondary and incidental to advancing its exempt purpose. (2) Petitioner serves public rather than private interests, and is not therefore disqualified from exemption under section 501(c)(3), I.R.C. *311 1954. Leslie Shields, *312 for the petitioner. Henry G. Salamy and Robert P. Rowe, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, *Judge: Petitioner has brought this proceeding for a declaratory judgment under section 7428. [1]
In his final adverse determination letter, respondent determined that petitioner did not qualify as an exempt organization under section 501(c)(3) for taxable years 1965 through 1982. The issues to be resolved herein are as follows: (1) Whether petitioner is operated exclusively for one or more of the exempt purposes specified in section 501(c)(3); (2) Whether petitioner's activities serve a public rather than a private interest. FINDINGS OF FACT By the parties' joint motion, this case has been submitted for decision under Rule 122, Tax Court Rules of Practice and Procedure. The administrative record, and genuineness of which has been stipulated by the parties, forms the basis for our findings of fact and is incorporated herein *313 by this reference. Under Rule 217(b), Tax Court Rules of Practice and Procedure, the facts represented in the administrative record are assumed to be true. Petitioner, Cleveland Creative Arts Guild, was incorporated as a non-profit corporation under the laws of the State of Tennessee on May 12, 1965. By its Charter, petitioner was organized for the following purposes: 1. To provide facilities and instruction for the development by individuals of creative abilities and skills in the fields of art, crafts, dance, drama, photography, sculpture and writing, to the end that the general culture of the community as a whole may be developed and enlarged. 2. To buy and sell real estate and to construct or acquire buildings for use in carrying out the aims and purposes of this corporation. 3. To give general support to any cultural or artistic undertaking in the community, whether instituted by this organization or not. 4. Generally to do all things reasonably necessary or pertinent to the accomplishment and carrying out of the purposes of this corporation set out in this charter. 5. *314 To possess and exercise all the powers granted General Welfare Corporations by the laws of Tennessee as more particularly set out in Chapter 11, Title 48, Sections 48-1101 through 48-1121, and Sections 48-1211, as amended, of the Tennessee Code. Articles of Amendment, adopted on March 13, 1982, added the following limitation on petitioner's activities and addition to petitioner's purposes: 2. Not withstanding [sic] any other provisions of this charter, this corporation will not carry on any other activities not permitted to be carried on by: (i) a corporation exempt from federal income tax under Section 501 c (3) [sic] of the Internal Revenue Code of 1954, or any other corresponding provisions of any future United States Internal Revenue Code. 3. This corporation is organized exclusively for charitable, religious, educational and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under 501(c)(3) [sic] of the Internal Revenue Code of 1954, or any corresponding provisions of any future United States Internal Revenue Code. The By-Laws state that petitioner's purpose "shall be to provide *315 creative opportunity and to advance the cultural life of the community" and that petitioner shall be "non-partisan and not for profit." Brochures distributed by petitioner to solicit membership describe petitioner's purpose as being "to contribute to the cultural maturity of [the] community" through the following functions: (1) By providing qualified instruction and activities in the arts. (2) By providing facilities and the environment for this purpose. (3) By giving encouragement to those who have creative skills. (4) By working with groups in developing or assisting with programs. (5) By providing a central source of information on the arts. (6) By serving as good-will ambassadors for Cleveland through the arts. (7) By encouraging youth and adults to support the arts in the community. (8) By endeavoring to enrich the life in our community through the arts. Petitioner consists of three major departments: art, drama and writing. It has no paid directors and operates largely through volunteer labor. Petitioner circulates a newsletter to its members on a regular basis, which provides information as to its art, writing and drama activities. Petitioner's Writing *316 Department, called the "Byliners," meets on a biweekly basis. The meetings are devoted to the study of various kinds of writing and to the presentation and critique of the members' own works. Petitioner, through the "Byliners," sponsors an annual creative writing contest known as the "LaVerne Ownbey Creative Writing Contest." Entrants compete for modest cash prizes in the following categories: fiction, general article, how-to article, poetry, juvenile, first person, most unforgettable person, and play. The contest, which is open to both adults and children, features first, second and third place winners in each category, as well as an overall "Best in Contest" prize, which is awarded at the annual writers' banquet held by the "Byliners." The funds for the contest are raised through a spring craft fair and used book sale. Through the Drama Department (known as the "Fantasticks"), petitioner sponsors the production of plays, including plays written by the "Byliners" group members. In 1980, the "Fantasticks" presented a two-act play, entitled "Follow the Eagle," [2] which was written by a "Byliner" for children and included children in the cast. In 1981, the group oroduced "the *317 Beringsford Experiment," a one-act play, which was also written by a "Byliner." Petitioner had no physical facilities of its own prior to 1981, and therefore the productions have been staged at various locations in the community, including schools, restaurants and clubhouses. Some of the plays have been produced in the dinner theater format. Through the Art Department, petitioner schedules art education programs at different locations throughout the community. In the past, these programs have included a wheel thrown pottery demonstration and a water color slide program. Petitioner also sponsors an art contest in which a $500 scholarship is awarded to an area artist under the age of 21. The contest entries are exhibited on petitioner's premises. Petitioner sponsors annual spring and fall art festivals. The spring festival is a two-day event that is free to the public and is held in a local shopping mall. Participating artists are allowed to exhibit *318 several original works and are eligible for cash prizes in the following categories: oil and acrylic, wet media (watercolor), dry media (pastel, charcoal, pencil, etc.), graphics, sculpture, mixed media and textiles. Participating artists are requested to submit photographs and publicity material with the entry form, and are advised that the photographs usually result in increased sales for the artist. In 1982, the Spring Art Festival featured 34 exhibitors, and resulted in sales of 30 out of the 340 works exhibited. The fall festival, which is known as the Nillie Bipper Outdoor Arts and Crafts Festival, is a two-day event, with a modest admission charge, [3] and which is held at Red Clay State Park. [4] Billie Nipper, from whose name the name of the show was derived, as a prominent local artist, was one of petitioner's organizers, and was a coordinator of the 1981 and 1982 Spring Art Festivals. The brochures for the 1981 and 1982 Nillie Bipper Festivals feature a photograph of Billie Nipper and contain the following statements: Each artist & craftsman has been carefully selected for excellence and ability to create quality work. Oil Painting Pottery Acrylic Painting Jewelry
*319 Sculpture Dried Flowers Watercolors Woodcarving Dolls Jellies & Jams Needlework Wooden Furniture Macrame Personalized Leathercraft All The Handcrafted Work Exhibited Will Make Excellent Christmas Gifts. The news release for the 1982 festival described it as one where "[a]pproximately 50 artists and craftsmen will show and sell all kinds of arts and crafts." The 1982 festival in fact featured 54 exhibitors. Out of the total 2200 works exhibited, 550 were sold. In connection with the Nillie Bipper Festival, petitioner receives what it calls "purchase awards" from businessmen. In return for these contributions, the donors receive art works that have bee donated to petitioner, with the expectation that the works will be publicly displayed by the donors. In the case of both festivals, there is no selection process employed in determining which works are to be exhibited, apart from the festival committee's screening of the entries *320 to eliminate any "unsuitable or objectionable material." There appears to be no established criteria to guide the festival committee in determining what works may be either "unsuitable" or "objectionable." [5]
In November, 1981, petitioner obtained a lease of a building at 150 Ocoee Street in Cleveland. Petitioner publicized the lease in the November 6, 1981 newsletter with an announcement of a "grand opening" scheduled for November 22, 1981.The announcement reads as follows: THE GRAND OPENING SUNDAY, NOVEMBER 22 1 to 5 p.m. Will Feature TWO Events 1. The Release of Artist Billie Nipper's Latest Print, "Dennis Mill", and 2. A Christmas Handicraft "Shop" from which Guild Members may sell their own original, handmade, saleable Christmas gifts or decorations. From the GRAND OPENING until Christmas, the "Shop" will be open each Friday and Saturday and probably the week of Christmas. If you have handmade items to sell (or know of someone who has), the requirements are: 1. Submit samples of the items for approval *321 either November 13th from 6 to 9 p.m. or November 14th from Noon to 5 p.m., 2. Have a Guild Membership (or join if not a member) and 3. Agree to pay 10% commission on sales to the Guild. (Art wall pieces must be framed or ready to hang.) The Christmas Handicraft Shop operates on a consignment basis and is open for one month of the year. In the Shop's first year, 1981, membership in petitioner was a condition to exhibiting and selling handicrafts at the Shop. Petitioner's January 1982 newsletter reports the 1981 results as follows: Member craftsmen and artists sold over $3,000 of their goods through the shoppe even though it was not open every day, nor for regular hours due to all labor being on a volunteer basis. The 1982 Christmas Handicraft Shop, which featured 41 exhibitors, resulted in a "profit" of $176.25 from estimated sales of 510 pieces of the estimated total 1,572 works exhibited. The "profit," however, only reflects gross sales receipts less amounts paid over to exhibitors, and does not take into account such costs as rent or utilities. An estimated 700-1,000 persons visited the shop in both 1981 and 1982. Prior to the commencement of the Christmas *322 Handicraft Shop, petitioner operated a Christmas Village sales activity for 1978 and 1979. The Christmas Village activity resulted in petitioner's receipt of entry fees and commissions totalling, in gross amounts, $394.70 in 1978 and $417.59 in 1979. Petitioner also operates a Spring Handicraft Shop on a cosignment basis. [6] Petitioner's March 1982 newsletter contains the following announcement: The Craft Shoppe will probably open again in Mid-April. We will be contacting everybody who had consignments at the Christmas Shoppe as well as any new members who have expressed interest in participating. The March 21, 1982 edition of the local newspaper, the Cleveland Daily Banner, published the following announcement: Artists interested in placing work in Cleveland Creative Arts Guild's Handcraft Shop on consignment are asked to bring it to the guild building across from the courthouse Monday, 4-7 p.m., through Saturday, 10 a.m.-2 p.m. Although work will be accepted from guild members only, non-members are urged to bring work and join the guild. All work must be original. None will be accepted if made from kits or molds. The CCAG Handcraft Shop will be open March 28, 2-5 *323 p.m. and thereafter Monday through Saturday, 11 a.m.-6 p.m. In 1982, petitioner had a total of 102 members participating in its three sections - writing, drama and arts. Its membership dues structure is as follows: Student
$2.00 Individual
10.00 Family
10.00 Contributing
10.00 Supporting
25.00 Patron
50.00 or more Benefactor
100.00
Angel
100.00 or more
During 1982, the Nillie Bipper Festival featured 54 exhibitors while the Spring Art Festival and the Christmas Handicraft Shop featured 34 and 41 exhibitors, respectively, for a total of 129 exhibitors. Petitioner estimates that a total of 35 of its members exhibited works at the various shows held during 1982. Petitioner's receipts exceeded expenditures from all sources in 1978 through 1981 as follows: Excess of
Year
Receipts
Expenditures
Receipts
1978
$5,338.27
$4,815.33
$522.94
1979
7,286.98
4,910.12
2,376.86
1980
6,421.86
4,628.36
1,793.50
1981
13,427.32
10,202.54
3,244.78
*324 Besides membership dues, petitioner's receipts include the entry fees and sales commissions charged artists exhibiting in the various shows, admission charges from the Nillie Bipper Festival and the Fantasticks' productions, concession fees from the Nillie Bipper Festival, purchase awards from local businesses, proceeds from the Byliners' used book sale and annual awards dinner, and interest earned on petitioner's bank accounts. Expenditures include general operating expenses, rent, utilities, supplies, postage, insurance, and advertising, as well as prizes, the art scholarship award, costs of the writers' banquet, and certain expenses specifically incurred in connection with the events sponsored by the three departments. Based upon the financial statements submitted by petitioner in connection with Form 1023, respondent computed receipts and expenditures with respect to the art and craft shows for the years 1978 through 1982 as follows: Receipts in
Excess of
Year
Receipts
Expenditures
Expenditures
(a) Spring Art Festival
1978
$313.50
$355.80
$ (42.30)
1979
413.35
407.00
6.35 1980
Not ascertainable
1981
285.30
794.80
(509.50)
1982
380.15
700.00
(319.85)
(b) Nillie Bipper Outdoor Arts and Crafts Festival
1978
$2,262.39
$1,895.83
$ 366.56 1979
3,515.85
1,897.70
1,518.15 1980
3,453.15
1,782.18
1,670.97 1981
5,039.45
2,686.98
2,352.47 1982
4,321.59
1,868.57
2,453.02 (c) Christmas Handicraft Shop (started 1981)
1981
$3,168.30
* $2,971.18
$197.12 1982
1,837.05
* 1,660.80
176.25 *325 In addition to commissions on sales, the Nillie Bipper Festival receipts for the years 1978 through 1981 include admission charges, entry fees and purchase awards. The breakdown of the annual total receipts is as follows: Entry
Purchase
Admission
Year
Commissions
Fees
Awards
Fees
1978
$331.10
$290.00
$325.00
$642.44
1979
573.62
240.00
1,125.00
1,004.25
1980
448.39
210.00
760.00
1,514.00
1981
1,528.55
450.00
930.00
2,131.90
Apart from the purchase award contributions, the only other contributions petitioner received for years 1978 through 1981 were membership dues. Petitioner's statement of assets and liabilities for 1978 through 1981 reads as follows: December 31, 1978
Assets - Checking Account
$ 4,616.98
Savings Account
9,932.62
[7] $14,579.60
Liabilities - None
December 31, 1979
Assets - Checking Account
$ 6,432.27
Savings Account
10,494.19
$16,926.46
Liabilities - None
December 31, 1980
Assets - Checking Account
$ 7,323.55
Savings Account
711.43
Certificate of Deposit
10,684.98
$18,719.96
Liabilities - None
December 31, 1981
Assets - Checking Account
$ 6,008.15
Savings Account
753.51
Certificate of Deposit
15,186.30
$21,947.96
Liabilities - None
*326 All labor, except for certain fees paid to qualified instructors, is performed by volunteers. Much of the advertising of the various activities takes the form of public service announcements. Officers and directors have included professors, journalists, well-known artists, professional theatrical directors, and homemakers. There is a regular rotation of officers, as well as contest judges, to encourage both broad participation and diverse art interests. Apart from petitioner, the only other museums, art galleries or shows within a fifty mile radius of Cleveland, Tennessee are the Dalton [Georgia] Creative Arts Guild and the Hunter Museum and Gallery in Chattanooga, Tennessee. Both of these organizations sponsor sales by participating artists. Petitioner first submitted its Form 1023, Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code, under cover letter dated March 17, 1982. On May 31, 1983, respondent *327 issued to petitioner a final adverse determination letter. ULTIMATE FINDINGS OF FACT Petitioner has exhausted its administrative remedies as required under section 7428(b)(2). Petitioner is operated exclusively for exempt purposes. Petitioner is not operated for a substantial, nonexempt commercial purpose. Petitioner serves public and not private interests. OPINION Section 501(c)(3) provides, in relevant part, that a corporation shall be exempt from tax under section 501(a) if the corporation is organized and operated exclusively for certain specified exempt purposes, if no part of its net earnings inure to the benefit of a private shareholder or individual, and if no substantial part of its activities consists of political or lobbying activities. Sec. 501(c)(3); Greater United Navajo Enterprises v. Commissioner,74 T.C. 69, 76 (1980), affd. without published opinion 672 F.2d 922 (9th Cir. 1981); Baltimore Regional Joint Board Health and Welfare Fund v. Commissioner,69 T.C. 554, 556-557 (1978). The requirement that an organization *328 must be organized and operated exclusively for exempt purposes in order to qualify for exempt status poses two tests, which must be independently satisfied. Sec. 1.501(c)(3)-1(a), Income Tax Regs. It is respondent's contention in his final adverse determination letter that petitioner is not entitled to exemption from tax because it does not meet the operational test. [8]
An organization is regarded as satisfying the operational test where its activities are primarily those which accomplish one or more exempt purposes as described in section 501(c)(3), and where no more than an insubstantial part of its activities furthers a non-exempt purpose. Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. Thus, despite the statutory language that the organization must be "operated exclusively" for exempt purposes, an insubstantial amount of non-exempt activity will not disqualify an organization from tax-exempt status. *329 The operational test focuses on the purpose and not on the nature of the activity, Federation Pharmacy Services v. Commissioner,72 T.C. 687 (1979), affd. 625 F.2d 804 (8th Cir. 1980); B.S.W. Group, Inc. v. Commissioner,70 T.C. 352 (1978); a substantial non-exempt purpose will disqualify an organization from tax exemption despite the number or the importance of its exempt purposes. Better Business Bureau v. United States,326 U.S. 279 (1945); Copyright Clearance Center v. Commissioner,79 T.C. 793, 804 (1982). The regulations under section 501(c)(3) recognize that an organization may engage in a trade or business as long as its operation furthers an exempt purpose and its primary objective is not the production of profits. Sec. 1.501(c)(3)-1(e)(1), Income Tax Regs; Greater United Navajo Enterprises v. Commissioner,74 T.C. 69 (1980); B.S.W. Group, Inc. v. Commissioner,supra.The regulations also provide that the operational test is not satisfied where any part of the organization's *330 earnings inure to the benefit of private shareholders or individuals, [9]Sec. 1.501(c)(3)-1(c)(2), Income Tax Regs., and where the organization serves a private rather than a public interest. Sec. 1.501(c)(3)-1(d)(1)(ii). Both the statute and the regulations include "charitable" and "educational" purposes as qualifying as exempt purposes. Sec. 501(c)(3); Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. The promotion of the arts has been recognized generally as constituting both a charitable and an educational purpose. Goldsboro Art League, Inc. v. Commissioner,75 T.C. 337, 343 (1980); Plumstead Theatre Society, Inc. v. Commissioner,74 T.C. 1324 (1980), affd. 675 F.2d 244 (9th Cir. 1982); Broadway Theatre League of Lynchburg, Va. v. United States,293 F. Supp. 346 (W.D. Va. 1968). In the present case, there is no dispute that *331 most of petitioner's activities, such as the art demonstrations and slide programs, student art competition, literary contest, and dramatic productions, are directed toward the exempt purposes of promoting the arts and enhancing public appreciation of various art forms. Respondent maintains, nevertheless, that petitioner fails the operational test because the various art festivals and craft shows further a substantial commercial purpose and serve the private interests of the artists participating in these events. Respondent views the administrative record as demonstrating that "[s]ales for sales' sake is an unmistakable theme permeating petitioner's art shows," and that therefore these activities further a substantial, non-exempt purpose. In determining whether an organization's non-exempt activities exceed the benchmark of insubstantially set out in the regulations, the factors to be considered include: (1) the manner in which the organization's activities are conducted, (2) the commercial hue of these activities, and (3) the existence and amount of profit from these activities. Goldsboro Art League, Inc. v. Commissioner,supra at 344; B.S.W. Group v. Commissioner,supra at 357. *332 After reviewing the administrative record with these factors in mind, we conclude that at most an insubstantial part of petitioner's activities serve a non-exempt purpose. Despite respondent's assertions to the contrary, we believe that the manner in which petitioner conducts its art shows serves its purpose of furthering public appreciation of the arts, especially in view of the fact that it operates in a community thirty miles from the nearest are gallery or museum. Cf. Goldsboro Art League, Inc. v. Commissioner,supra at 344. The Nillie Bipper and Spring Art Festivals are each two-day events, and the Christmas and Spring Handicraft Shops are each one month events. Although respondent makes much of the fact that, unlike the petitioner in Goldsboro Art League, Inc., petitioner did not screen the entries for artistic merit, we do not find that the absence of a selection process is necessarily indicative of a commercial purpose, especially in light of the fact that the festivals and shows with which we are concerned here were of short duration, while the petitioner in Goldsboro Art League, Inc. maintained a year-round gallery. The competition aspect *333 of the Spring Art Festival, in any event, provides participating artists with an incentive to display their finest works. In keeping with its goal of making various art forms accessible to the community in which it operates, petitioner charges no admission to the Spring Art Festival and to the Christmas and spring craft shows, and only charges a nominal admission fee for the Nillie Bipper Festival. We believe that, when the various festivals and shows are viewed in connection with petitioner's other activities, the picture that emerges is one of educating the public, through a variety of means, to the broadest possible range of art forms. Petitioner's sales activities are clearly incidental to its educational activities and are but a means to the end of increasing public appreciation of the arts. Goldsboro Art League, Inc. v. Commissioner,supra. See Aid to Artisans, Inc. v. Commissioner,71 T.C. 202 (1978); Golden Rule Church Association v. Commissioner,41 T.C. 719 (1964). The financial results of the various art and craft festivals do not support respondent's assertion that the events are profit-motivated. Petitioner *334 retains only a 10 percent commission on sales by participating artists and uses this amount to defray expenses. [10] The Spring Art Festival resulted in a loss in every year except 1979, in which year a profit of $6.35 was realized. Although the Christmas Handicraft Shop resulted in gross receipts of $3,168.30 and $1,3837.05 for 1981 and 1982, the commissions of $197.12 and $176.25 remaining after remitting sales proceeds to exhibitors can hardly be described as profits, given that the figures do not reflect a proportionate share of petitioner's rent, utilities and general operating expenses. While the results of the Nillie Bipper Outdoor Arts and Crafts Festival have consistently been profitable, the profits are partially due to the fifty-cent admission charge and not wholly due to the sales activities that respondent finds objectionable. Respondent also maintains that petitioner did not receive any contributions *335 but relied on the sales activities for funding. The financial statements, however, demonstrate that membership dues, purchase awards and interest on its bank accounts play an equally significant role in petitioner's funding. In addition, a factor that does not appear on the financial statements, but which is undoubtedly critical to petitioner's operations, is that petitioner is the beneficiary of its members' volunteer labor and of public service advertising by the local media. We believe that respondent's determination that petitioner operated for a substantial non-exempt purpose is based upon respondent's focusing unduly on portions of the advertising campaigns for the various art and craft festivals. As a result, respondent has overlooked the non-commercial purpose of the festivals, and has virtually overlooked the other clearly non-commercial activities of the Art Department (the art competitions, scholarship award, and various art demonstrations), as well as the activities of the Writing and Drama Departments. [11] After reviewing the administrative record, in its entirety, we are of the opinion that the sales activities in question are incidental to the exempt purpose of promoting *336 the arts in the Cleveland, Tennessee community. Respondent's second basis for ruling that petitioner does not meet the operational test is his determination that petitioner serves the private interests of its members rather than the public interest. Respondent bases his determination that petitioner violates the prohibition against private benefit set out in Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs., [12] on the manner in which petitioner plans, advertises and promotes its arts and crafts shows, the absence of criteria for selecting works to be exhibited in the shows, and the amount of participation by the member-artists in the shows. Respondent views petitioner's operation of the art and craft festivals as analogous to a commercial art gallery, and particularly emphasizes the percentage of members exhibiting in the different shows in 1982. [13]
*337 We disagree with respondent's characterization. We have hereinabove found that the purpose behind the art and craft shows was to promote the arts within the Cleveland, Tennessee area, which purpose includes enhancing the public's appreciation of a variety of art forms. As previously discussed, the sales activities served to advance petitioner's exempt purposes, and any commercial aspects were incidental to the performance of its exempt functions. The absence of any selection criteria does not, in our view, establish that petitioner operates for private purposes. Petitioner maintains that the reason for not employing a formal selection process was to ensure representation of the broadest range of art forms possible, and we find nothing in the record that would suggest otherwise. Participation in all of the events sponsored by petitioner is open to the general public, with the exception of the Spring Handicraft Shop, and the Christmas Handicraft Shop in the first year of operation. Although a significant percentage of petitioner's members have exhibited their work in the various events, the majority of the exhibiting artists have not been members of petitioner, but unrelated *338 third parties, to whom the prohibition against private inurement does not apply. Goldsboro Art League, Inc. v. Commissioner,supra;Broadway Theatre League of Lynchburg, Va. v. United States,supra.
Respondent makes much of the fact that the degree of member participation in the various shows and festivals, exceeded that present in Goldsboro Art League, Inc. v. Commissioner,supra, and therefore argues that our decision in favor of the taxpayer in that case does not control the disposition of the present controversy. Whether an organization satisfies the operational test depends upon the totality of the facts and circumstances, and no one fact is determinative. We believe that the facts and circumstances presented herein inescapably point to the conclusion that petitioner serves the public interest and not private purposes. To reflect the foregoing, Decision will be entered for petitioner.
Footnotes
*. By order of the Chief Judge, this case has been assigned to Judge Julian I. Jacobs↩ for disposition. 1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. "Follow the Eagle" depicts the effects that the evacuation of the Cherokees from Red Clay, Tennessee had on the children of the tribe. The production was co-sponsored by the local International Year of the Child committee.↩
3. Admission for adults is fifty cents. Children are admitted without charge. ↩
4. It appears from the record that, prior to 1981, the Nillie Bipper Festival was held on the grounds of the local Knights of Columbus clubhouse.↩
5. On brief, petitioner describes its right to remove "unsuitable or objectionable material" as "the right to remove vulgar or pornographic material."↩
6. The Spring Handicraft Shop is apparently an event separate and distinct from the Byliners' annual spring craft and used book sale and the two-day Spring Art Festival.↩
*. [Expenditures for rent and utilities have not been included in the figures shown.]↩
7. The total amount of assets for 1978 shown here is that contained in the administrative record. Assuming that the bank account balances shown are accurate, we compute the total to be $14,549.60.↩
8. Respondent does not dispute that petitioner was organized for exempt purposes.↩
9. Section 1.501(a)-1(c), Income Tax Regs.↩, defines "private shareholder or individual" to include "persons having a personal and private interest in the activities or the organization."
10. In Goldsboro Art League, Inc. v. Commissioner,75 T.C. 337↩ (1980), in which we held that the taxpayer-organization, which operated an art gallery, satisfied the operational test, the taxpayer-organization received a twenty percent commission on sales.
11. We find it noteworthy that the Drama Department has not limited itself to productions of the works of established playwrights, but has in the past produced the works of unknown writers, including members of the "Byliners."↩
12. Section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs., provides as follows: (ii) An organization is not organized or operated exclusively for one or more of the purposes specified in subdivision (i) of this subparagraph unless it serves a public rather than a private interest. Thus, to meet the requirement of this subdivision, it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests.↩
13. Respondent, in comparing the degree of member participation in Goldsboro Art League, Inc. v. Commissioner,supra, with that present in the instant case, computes the percentage of membership participation herein for 1982 by comparing the number of member-exhibitors (35) with the total number of petitioners' members (102). In Goldsboro,↩ the percentage was computed by comparing the total number of member-exhibitors (2) with the total number of exhibitors (100). We think that it is obvious, in considering member participation as an indication of the existence of private inurement, that the appropriate comparison is that of member-exhibitors to all exhibitors. Thus, for 1982 the degree of member participation herein is approximately 28% (i.e., thirty-five out of a total of 129 exhibitors) rather than the 35% figure calculated by respondent.