AMERICAN CAMPAIGN ACADEMY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4787-88X.    Filed May 16, 1989.

*Gerald H. Sherman* and *Deborah M. Beers,* for the petitioner.

*Henry G. Salamy* and *Joan R. Domike,* for the respondent.

### OPINION

NIMS, *Chief Judge:* Petitioner seeks a declaratory judgment under section 7428(a)[1] that it is exempt from Federal income taxation under section 501(a) as an organization meeting the requirements of section 501(c)(3). Further, should we declare petitioner to satisfy the requirements of section 501(c)(3), we are requested to also determine whether petitioner is classified as "other than a private foundation" by reason of sections 509(a)(1) and 170(b)(1)(A)(ii). Based upon our holding that petitioner is nonexempt under section 501(c)(3), we do not reach the latter issue.

Pursuant to Rule 122, the case was submitted for decision with the stipulated administrative record, as defined in Rule

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 and all Rule references are to the Tax Court Rules of Practice and Procedure.

210(b)(11). For purposes of this proceeding, we accept the facts and representations contained in the administrative record as true and incorporate them herein by this reference. Petitioner has exhausted its administrative remedies within the Internal Revenue Service as required by section 7428(b)(2) and Rule 210(c)(4), received a final adverse ruling mailed on December 15, 1987, and invoked the jurisdiction of this Court by petition filed March 11, 1988.

## FACTUAL BACKGROUND

Petitioner, American Campaign Academy (also referred to hereinafter as petitioner or the academy), is a Virginia corporation incorporated by Jan W. Baran, General Counsel of the National Republican Congressional Committee, on January 24, 1986, exclusively for charitable and educational purposes, including:

A. Organizing and operating a school to train individuals for careers as campaign managers, communications directors, finance directors or other political campaign professionals;

B. Sponsoring research and publishing instructional materials, reports, newsletters, pamphlets or books relating to the conduct of a political campaign;

C. Sponsoring research, to include public opinion research or polling, concerning the public's attitude toward political issues or problems and the publishing of reports, pamphlets, books or other materials to be made available to the general public;

D. Elevating the standards of professionalism, ethics and morality that prevail in the conduct of campaigns for election to public office at the national, state and local levels.

At the time petitioner filed its petition, its principal place of business was located in Arlington, Virginia.

As its primary activity, petitioner operates a school to train individuals for careers as political campaign professionals. Petitioner's school maintains a regularly scheduled curriculum, a regular faculty, and a full-time enrolled student body at the facilities it occupies. Petitioner claims that it is the only school to exclusively offer a highly concentrated and extensive campaign training curriculum. Similar campaign management courses are offered by American University, Kent State University, Westminster College in Utah, Georgia State University, North Florida State,

San Francisco State College, University of California-Davis, University of Southern California and Bernard Baruch College in New York. Seminars offering campaign training are also sponsored by such groups as the Republican National Committee Campaign Management College, United States Campaign Academy, The Leadership Institute, Committee for the Survival of a Free Congress, and the Democratic National Committee. Petitioner has no connection with any of these training programs.

Prior to the organization of the academy, the National Republican Congressional Committee (NRCC), an unincorporated association comprised of Republican members of the United States House of Representatives, sponsored programs designed to train candidates and to train and subsequently place campaign professionals in Republican campaigns. A campaign professional works for a candidate. Campaign professionals typically occupy such strategic campaign positions as communications director, finance director, or campaign manager.

The academy stated on its Application for Recognition of Exemption (Form 1023) that it was an "outgrowth" of the course of instruction run by the NRCC. NRCC contributed physical assets such as furniture and computer hardware to the academy. Two of the academy's six full-time faculty were previously involved in the NRCC's training program. One of the academy's three initial directors, Joseph Gaylord, is the Executive Director of the NRCC. Another initial director, John C. McDonald, is a member of the Republican National Committee.

NRCC continues to offer training for Republican candidates and staff members of incumbent Republican congressmen. The administrative record does not reveal to what extent, if any, NRCC continues to offer training to campaign professionals.

The academy program for training campaign professionals differs from its predecessor NRCC program. Significantly, unlike the NRCC, the academy limits its students to "campaign professionals." The academy does not train candidates nor participate in, nor intervene in, any political campaign on behalf of any candidate. Neither does the academy engage in any activities tending to influence

legislation. Moreover, while the academy actively refers resumes and provides recommendations of graduates to requesting campaigns, it assumes no formal placement responsibilities. Nonetheless, in June 1986, after the first 1986 primary elections were completed, the academy included in its newsletter (see discussion *infra*) the following invitation to all graduates:

### LOST YOUR PRIMARY?

Hate your candidate? Can't deal with the weather? The primary's over, you lost. NEED A NEW JOB??

Having troubles finding that new job because someone's unfairly trashing your work? Nobody's listening to your side of the story? NEED HELP?

Call your friends at the ACA.

Just because we don't send you checks on Fridays doesn't mean we don't still stand ready to try to help you out of those sticky professional wickets.

Think about it—it's in our best interest that you do well. The success of the Academy can only be based on the contributions of our students. Our futures *are* inextricably linked.

*   *   *   *   *   *   *

Thanks to you all and the good work you're doing out there on the battlefields of democracy, the world is pretty aware that the Academy exists. More than that, that same world does call us looking for good folks to fill their urgent campaign needs.

If the need arises, call us up, send us a current resume, we'll see what we can do about getting you off the streets.

At least 15 graduates secured new campaign positions with Congressional and Senatorial candidates following publication of petitioner's invitation.

No training materials developed by the NRCC are used by the academy. Rather, the academy has generally hired its own faculty, developed its own courses, and enhanced the training curriculum. The academy's faculty consists of 5-6 full-time members and approximately 141 adjunct members. Training materials used by students include compilations and handouts, published textbooks, trade books and articles, and faculty-prepared lecture materials.

The academy has more applicants for admission than its physical facilities can accommodate. Thus, its admissions criteria are competitive. The academy seeks to admit applicants who have a strong commitment to professional

campaign involvement on the Congressional level. The academy believes committed applicants will possess at least four of the following qualifications:

1. *Paid campaign experience.* Applicant should have worked on a political campaign as a campaign staff member with considerable responsibility on the local, state or federal level.

2. *Volunteer campaign experience.* Applicant should have volunteered time to a campaign to assist the efforts of the campaign.

3. *Journalism/Public relations background.* Applicant should have either a journalism background or practical experience working for a newspaper, radio or television station, advertising agency or political consulting firm.

4. *College graduate.*

5. *Political experience.* Applicant should have worked in a congressional office, state office, trade association, state or national political committee.

6. Civic responsibility. Applicant should have actively served in a civic/volunteer organization or campus political organization.

7. *Fundraising experience.* Applicant should have worked in a fundraising campaign (for an organization, school, political campaign, etc.), preferably in a management or direct solicitation role.

8. *Organizational experience.* Applicant should have played a principle role in the production of a program, event, organization, etc., which required coordinating people and resources in a defined time frame.

Each applicant provides the academy with the details of his or her qualifications in each applicable category. In addition, applicants are asked to provide at least two political and two professional references. And while applicants are not required to formally declare their political affiliation to attend the academy, such affiliations may often be deduced from the campaign experiences and political references contained in the application. Applicants may freely volunteer their political party affiliation. The academy maintains no records indicating the number of applicants who are Republicans, Democrats, associated with other parties, or independent.

Completed applications for admission to the academy are evaluated by an admissions panel. The academy has no requirement that a member of the admissions panel be affiliated with any particular political party. However, the academy believes that a substantial number of the members of its admissions panel are affiliated with the Republican party. The academy does not discriminate on the basis of race, color, national, or ethnic origin in admitting students,

in administering its educational policies and school-sponsored programs, or in granting financial assistance.

The academy's curriculum presents a considerable body of knowledge to be learned and skills to be mastered in preparing the student to perform effectively as a campaign professional. Initially, the curriculum offered by the academy was divided into two parts. In part one of the curriculum, each student enrolled in an intensive overview course, lasting several weeks, designed to highlight the major elements of a political campaign. In part two of the curriculum, each student would enroll in one of three training programs providing specialized instruction in campaign management, campaign finance, or campaign communications.

Based upon feedback from its earliest graduating class, the academy determined that a single unified curriculum, rather than a two-part specialized approach, would best prepare students to meet the challenges faced by campaign professionals. The academy presently offers a single 10-week general program to all students. Current courses of instruction explore such topics as campaign strategy, the American political system and its environment, research techniques, organization basics, campaign strategy, professional ethics, Federal Election Commission rules and regulations, campaign financing techniques, voter surveying, vote targeting, issue development, media communications, speechwriting, volunteer recruiting and organizing, budgeting, coalition building and basic computer applications. Discussions concerning "How some Republicans have won Black votes," "NRCC/RNC/NRSC/State Party naughtiness," and "Use of GOP allies" are included in the campaign strategy and organizational courses.

Students are expected to master the campaign fundamentals taught in the curriculum. Mastery of coursework requires students to attend daily classes from 9:00 a.m. to 5:30 p.m., and to complete demanding case studies, role-playing assignments, research projects and various homework exercises. Periodic evaluations are given to measure each student's performance. Students who fail to adequately perform may be dismissed from the program. To encourage students to concentrate their efforts on mastering the

presented materials, students are prohibited from holding full- or part-time jobs during their 10-week enrollment. Students admitted to the academy are not charged tuition and receive a nominal weekly stipend during their course of study.

Following graduation, academy students are expected to apply their newly acquired knowledge and skills in a political campaign. If a graduate fails to put forth a good faith effort to secure a position in a campaign, the academy may withhold its recommendation. Approximately 80 percent of the academy's graduates served on political campaigns during 1986.

Beginning June 6, 1986, the academy began publishing a monthly newsletter entitled "A Hundred Battles." The first newsletter announced that on May 16, 1986, the last students for the 1986 campaign year were graduated, bringing the total graduates to 120. During the months of June through September 1986, the newsletter tracked the activities of 119 of the academy's 120 graduates. As reported in the four newsletters, 85 graduates participated in the campaigns of Congressional or Senatorial candidates, four graduates were employed by the NRCC or Republican National Committee Field Divisions, 10 graduates participated in gubernatorial or other State-wide or local campaigns, at least three graduates were employed by various State Republican parties, and several graduates worked as political consultants. Many graduates whose candidates were defeated in the 1986 primary elections joined the campaigns of other candidates. In total, academy graduates filled important positions in approximately 98 Congressional and Senatorial campaign positions during the 1986 election cycle. In addition, one graduate worked in a presidential campaign in a foreign country.

On September 16, 1986, respondent requested petitioner to provide additional information regarding several matters. One matter concerned the affiliation of the candidates served by petitioner's graduates. Specifically, respondent asked:

Of the individuals that have already graduated from your programs, how many (to the best of your knowledge) are currently working for

Republican candidates? How many are working for Democratic candidates? Other parties?

On October 3, 1986, petitioner answered respondent's inquiry as follows:

We do not require students to remain in contact with the Academy following graduation. Of those who chose to do so, some have informed the Academy of the identity of the candidate(s) for whom they are working. (See the [attached] newsletters * * * .) To the best that can be determined, the predominant party affiliation of the candidates for whom Academy graduates are working in 1986 is Republican, but the Academy has no exact numbers.

Following the 1986 Federal election, approximately 46 percent of the academy's graduates were either unemployed or employed in nonpolitical positions.

Funding for the academy's activities has been exclusively provided by the National Republican Congressional Trust (NRCT), an organization that collects political contributions and uses such funds for purposes approved by the Federal Election Commission. No funding has been received from any candidate's campaign committee. NRCT funding through August 1987, reached $972,000. The academy has estimated that 90 percent of its funding is expended to run its school. The remaining 10 percent of funding has been dedicated to research and the publishing of reports, pamphlets, books, or other materials to be made available to the general public.

## DISCUSSION

Section 501(a) [2] exempts organizations described in section 501(c) from Federal income tax. In order to qualify for

---

[2]Sec. 501 provides in relevant part as follows:

SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

  *   *   *   *   *   *   *

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

  *   *   *   *   *   *   *

(3) Corporations * * * organized and operated exclusively for * * * educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, * * * and which does not participate in, or

an exemption under section 501(c)(3), an organization must satisfy four criteria: (1) It must be organized and operated exclusively for certain specified exempt purposes, including educational purposes; (2) no part of its net earnings may inure to the benefit of a private shareholder or individual; (3) no part of its activities may constitute intervention or participation in any political campaign on behalf of any candidate for public office; and (4) no substantial part of its activities may consist of political or lobbying activities. Sec. 501(c)(3). These requirements are stated in the conjunctive. Petitioner's failure to satisfy any of the four requirements is fatal to its qualification under section 501(c)(3). *Levy Family Tribe Foundation v. Commissioner,* 69 T.C. 615, 618 (1978). In addition to satisfying each condition specified in section 501(c)(3), petitioner must also establish that its purpose is not contrary to public policy. *Bob Jones University v. United States,* 461 U.S. 574, 591-593 (1983).

The responsibility for ruling on the section 501(c)(3) exempt status of an organization lies with respondent, who, based upon the uninvestigated statements of fact submitted by the taxpayer, must determine whether each of the prescribed requirements is met. *Houston Lawyer Referral Service, Inc. v. Commissioner,* 69 T.C. 570, 573 (1978). Respondent discharges his responsibility pursuant to highly detailed administrative procedures. See Statement of Procedural Rules (SPR hereinafter), 26 C.F.R. sec. 601.201(n) (1988); sec. 1.508-1, Income Tax Regs. If in respondent's judgment the organization fails to qualify for exempt status, the reasons for disqualification are normally (and were in the case at bar) articulated in a notice of final determination issued to the organization. The organization which has properly exhausted its administrative remedies may thereafter timely petition for judicial review of respondent's denial by this Court, the U.S. Claims Court, or the U.S. District Court for the District of Columbia. Sec. 7428 and SPR, 26 C.F.R. sec. 601.201(n)(5)-(7).

A timely petition made under section 7428(a) confers jurisdiction on this Court to declare whether the petitioning

intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

organization initially qualifies or continues to qualify under section 501(c)(3) as an exempt section 501(a) entity. In making our declaration, we do not, however, engage in a de novo review of the administrative record. *Houston Lawyer Referral Service, Inc. v. Commissioner,* 69 T.C. at 577. Rather, we "base [our] determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination, or based upon any new argument which the Service may wish to introduce at the time of the trial." See H. Rept. 94-658, at 285 (1976), 1976-3 C.B. (Vol. 2) 977. Thus, the scope of our inquiry and declaration is limited to the propriety of the reasons given by respondent for denying petitioner's application for exempt status. *Aid to Artisans, Inc. v. Commissioner,* 71 T.C. 202, 208 (1978).

Respondent concedes that (1) petitioner is organized exclusively for exempt purposes, i.e., educational purposes, (2) no part of petitioner's net earnings inure to the benefit of a private shareholder or individual, (3) no substantial part of petitioner's activities consists of political or lobbying activities, and (4) petitioner is not involved in any proscribed campaign activities. Likewise, respondent makes no contention that the activities of the academy are contrary to established public policy. Rather, respondent rests his denial of the academy's application for exempt status solely on the academy's alleged failure to operate exclusively for exempt purposes. Specifically, respondent's final ruling letter states:

> You have failed to establish that you are operated exclusively for exempt purposes as required by section 501(c)(3). You are operated for a substantial non-exempt private purpose. You benefit Republican Party entities and candidates more than incidentally. Also, your activities serve the private interests of Republican Party entities rather than public interests exclusively.

Respondent does not assert at this proceeding any additional bases for denying petitioner's application.

We note at the outset that petitioner bears the burden of overcoming the grounds set forth in respondent's final ruling letter. Rule 217(c)(2)(i). To prevail herein, petitioner must show, based upon the materials in the administrative record, that it does not operate to benefit Republican Party

entities and candidates more than incidentally or that such benefits do not serve a private rather than a public interest. See *Hancock Academy of Savannah, Inc. v. Commissioner,* 69 T.C. 488, 492 (1977); *B.S.W. Group, Inc. v. Commissioner,* 70 T.C. 352, 356 (1978); sec. 1.501(c)(3)-1(c), Income Tax Regs.

## Operational Test

The operational test of section 1.501(c)(3)-1(c)(1), Income Tax Regs., is designed to insure that the organization's resources and activities are devoted to furthering exempt purposes. The operational test examines the actual purpose for the organization's activities and not the nature of the activities or the organization's statement of purpose. *Kentucky Bar Foundation v. Commissioner,* 78 T.C. 921, 923-924 (1982). In testing compliance with the operational test, we look beyond the four corners of the organization's charter to discover "the actual objects motivating the organization and the subsequent conduct of the organization." *Taxation with Representation v. United States,* 585 F.2d 1219, 1222 (4th Cir. 1978), citing *Samuel Friedland Foundation v. United States,* 144 F. Supp. 74, 85 (D.N.J. 1956); *Christian Manner International v. Commissioner,* 71 T.C. 661, 668 (1979). What an organization's purposes are and what purposes its activities support are questions of fact. *Christian Manner International v. Commissioner,* 71 T.C. at 668. We may draw factual inferences from the administrative record in the performance of our review function. *Nat. Assn. of American Churches v. Commissioner,* 82 T.C. 18, 20 (1984).

The Treasury Regulations specify three conditions which must be satisfied for an organization to meet the operational test. *Church By Mail, Inc. v. Commissioner,* 765 F.2d 1387, 1391 (9th Cir. 1985), affg. T.C. Memo. 1984-349. First, the organization must be primarily engaged in activities which accomplish one or more of the exempt purposes specified in section 501(c)(3). Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. Second, the organization's net earnings must not be distributed in whole or in part to the benefit of private shareholders or individuals. Sec. 1.501(c)(3)-1(c)(2), Income Tax Regs. Third, the organization must not be an "action"

organization, i.e., one which devotes a substantial part of its activities attempting to influence legislation, or participates or intervenes, directly or indirectly, in any political campaign. Sec. 1.501(c)(3)-1(c)(3), Income Tax Regs.

Respondent does not contend that petitioner's earnings inure to the benefit of private shareholders or individuals, or that petitioner is an action organization. Rather, respondent recognizes on brief that "Academy would * * * be described in section 501(c)(3) so long as it serves a public interest as required by section 1.501(c)(3)-1(d)(1)(ii) [Income Tax Regs.]." Thus, the sole issue for declaration is whether respondent properly determined that petitioner failed to satisfy the first condition of the operational test by not primarily engaging in activities which accomplish exempt purposes.

## Operating Primarily for Exempt Purposes

To establish that it operates primarily in activities which accomplish exempt purposes, petitioner must establish that no more than an insubstantial part of its activities does not further an exempt purpose. Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.[3] The presence of a single substantial nonexempt purpose destroys the exemption regardless of the number or importance of the exempt purposes. *Better Business Bureau v. United States,* 326 U.S. 279, 283 (1945); *Copyright Clearance Center v. Commissioner,* 79 T.C. 793, 804 (1982).

When an organization operates for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests, the organization by definition does not operate exclusively for exempt purposes. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs.[4] Prohibited private benefits may include an "advan-

[3]Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs., provides:

(c) *Operational test.* (1) *Primary activities.* An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

[4]Sec. 1.501(c)(3)-1(d), Income Tax Regs., provides in part:

(d) *Exempt purposes.* (1) *In general.* (i) An organization may be exempt as an organization described in section 501(c)(3) if it is organized and operated exclusively for one or more of the following purposes:

tage; profit; fruit; privilege; gain; [or] interest." *Retired Teachers Legal Fund v. Commissioner,* 78 T.C. 280, 286 (1982). Occasional economic benefits flowing to persons as an incidental consequence of an organization pursuing exempt charitable purposes will not generally constitute prohibited private benefits. *Kentucky Bar Foundation v. Commissioner,* 78 T.C. at 926. Thus, should petitioner be shown to benefit private interests, it will be deemed to further a nonexempt purpose under section 1.501(c)(3)-1(d)(1) (ii), Income Tax Regs. This nonexempt purpose will prevent petitioner from operating primarily for exempt purposes absent a showing that no more than an insubstantial part of its activities further the private interests or any other nonexempt purposes. Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.

Respondent contends that petitioner's activities substantially benefit the private interests of Republican party entities and candidates, thereby advancing a nonexempt private purpose. Petitioner counters that respondent erred in denying its exemption application by incorrectly applying the private benefit analysis of section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs., to persons other than a "private shareholder or individual" within the meaning of section 1.501(a)-1(c), Income Tax Regs. Section 1.501(a)-1(c), Income Tax Regs., defines the words "private shareholder or individual" as persons having a personal and private interest in the activities of the organization (hereinafter private shareholders or individuals are sometimes referred to as insiders). Alternatively, petitioner argues that the private benefits, if any, conferred on various Republican entities and candidates were incidental to the exempt public educational purposes its activities further.

(a) Religious,
(b) Charitable,
(c) Scientific,
(d) Testing for public safety,
(e) Literary,
(f) Educational, or
(g) Prevention of cruelty to children or animals.

(ii) An organization is not organized or operated exclusively for one or more of the purposes specified in subdivision (i) of this subparagraph unless it serves a public rather than a private interest. Thus, to meet the requirement of this subdivision, it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests.

## Unrelated Parties and Private Interests

We begin our analysis by considering whether an organization may transgress the "public rather than a private interest" mandate of section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs., by conferring benefits on persons not having a personal and private interest in the activities of the organization. See secs. 1.501(c)(3)-1(c)(2) and 1.501(a)-1(c), Income Tax Regs. Petitioner maintains that the prohibition against private benefit is limited to situations in which an organization's insiders are benefited. Petitioner further contends that since "Republican Party entities and candidates" cannot be construed as insiders of its organization, no transgression of the operational test exists.

In support of limiting the private benefit analysis to insiders, petitioner compares the language of section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. (see *supra*, n. 4), to the statutory and regulatory language prohibiting the inurement of organizational earnings to private shareholders and individuals. Sec. 501(c)(3) and secs. 1.501(c)(3)-1(c)(2)[5] and 1.501(a)-1(c),[6] Tax Income Regs. Petitioner asserts that the class of persons illustrated in section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. (i.e., designated individuals, the creator or his family, shareholders of the organization or persons controlled directly or indirectly by such private interests), overlaps with the class of persons identified by section 501(c)(3) and section 1.501(a)-1(c), Income Tax Regs., as insiders in the private inurement context (i.e., persons having a personal and private interest in the activities of the organization). Petitioner believes that this overlap "clearly indicates" that both the prohibition against private inurement and the prohibition against conferral of substantial private benefits exclusively target the same class of persons.

---

[5]Sec. 1.501(c)(3)-1(c)(2), Income Tax Regs., provides in part:

(c) *Operational test.* * * *

(2) *Distribution of earnings.* An organization is not operated exclusively for one or more exempt purposes if its net earnings inure in whole or in part to the benefit of private shareholders or individuals. * * *

[6]Sec. 1.501(a)-1(c), Income Tax Regs., provides:

(c) *"Private shareholder or individual" defined.* The words "private shareholder or individual" in section 501 refer to persons having a personal and private interest in the activities of the organization.

Petitioner reasons that because this Court has explicitly excluded unrelated third parties from the ambit of the term "private shareholder or individual" in the earnings inurement context, *People of God Community v. Commissioner,* 75 T.C. 127, 133 (1980), unrelated third parties must likewise be excluded from the class of private persons whose receipt of a substantial benefit would cause the organization to be operated other than exclusively for exempt purposes. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. Accordingly, petitioner concludes that since Republican entities and candidates are not interested insiders, the private benefit analysis of section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs., is inapplicable in the case at bar. We do not agree.

Petitioner misconstrues the overlapping characteristics of the private benefit and private inurement prohibitions. We have consistently recognized that while the prohibitions against private inurement and private benefits share common and often overlapping elements, *Church of Ethereal Joy v. Commissioner,* 83 T.C. 20, 21 (1984), *Goldsboro Art League, Inc. v. Commissioner,* 75 T.C. 337, 345 n. 10 (1980), the two are distinct requirements which must independently be satisfied. *Canada v. Commissioner,* 82 T.C. 973, 981 (1984); *Aid to Artisans, Inc. v. Commissioner,* 71 T.C. at 215. Nonetheless, we have often observed that the prohibition against private inurement of net earnings appears redundant, since the inurement of earnings to an interested person or insider would constitute the conferral of a benefit inconsistent with operating exclusively for an exempt purpose. *Western Catholic Church v. Commissioner,* 73 T.C. 196, 209 n. 27 (1979), affd. in an unpublished opinion 631 F.2d 736 (7th Cir. 1980). See also sec. 1.501(c)(3)-1(c)(2), Income Tax Regs. In other words, when an organization permits its net earnings to inure to the benefit of a private shareholder or individual, it transgresses the private inurement prohibition and operates for a nonexempt private purpose.

The absence of private inurement of earnings to the benefit of a private shareholder or individual does not, however, establish that the organization is operated exclusively for exempt purposes. Therefore, while the private inurement prohibition may arguably be subsumed within

the private benefit analysis of the operational test, the reverse is not true. Accordingly, when the Court concludes that no prohibited inurement of earnings exists, it cannot stop there but must inquire further and determine whether a prohibited private benefit is conferred. See *Aid to Artisans, Inc. v. Commissioner*, 71 T.C. at 215; *Retired Teachers Legal Fund v. Commissioner*, 78 T.C. 280, 287 (1982).

Moreover, an organization's conferral of benefits on disinterested persons may cause it to serve "a private interest" within the meaning of section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. *Christian Stewardship Assistance, Inc. v. Commissioner*, 70 T.C. 1037 (1978). See *Kentucky Bar Foundation v. Commissioner, supra; Aid to Artisans, Inc. v. Commissioner, supra;* see also *The Martin S. Ackerman Foundation v. Commissioner*, T.C. Memo. 1986-365. In this connection, we use "disinterested" to distinguish persons who are not private shareholders or individuals having a personal and private interest in the activities of the organization within the meaning of section 1.501(a)-1(c), Income Tax Regs.

## Presence of Private Benefits

Having determined that nonincidental benefits conferred on disinterested persons may serve private interests, we now consider whether respondent erred in determining that petitioner conferred nonincidental private benefits upon Republican entities and candidates. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. Petitioner contends that Rev. Rul. 76-456, 1976-2 C.B. 151, prescribes the proper characterization of all benefits conferred by organizations engaging in its type of activities. In this revenue ruling, an organization collected, collated, and disseminated information concerning general campaign practices on a nonpartisan basis. The organization also furnished "teaching aids" to political science and civics teachers. Emphasizing the organization's nonpartisan nature, respondent determined that the organization exclusively served a public purpose by encouraging citizens to increase their knowledge and understanding of the election process and participate more effectively in their selection of Government officials.

We note that revenue rulings are not binding precedent on this Court, but rather are viewed as contentions of respondent. *Frontier Savings Association v. Commissioner*, 87 T.C. 665, 678 (1986), affd. 854 F.2d 1001 (7th Cir. 1988). However, where a revenue ruling incorporates a long-standing administrative practice sanctioned by the courts or the Congress, it may acquire the force of law. See *United States v. Correll*, 389 U.S. 299, 303-306 (1967). Furthermore, it seems self-evident that in general a taxpayer may rely on a revenue ruling where parallel facts place the ruling in the posture of a concession by the Commissioner as to the analogous taxpayer. Nevertheless, because we distinguish petitioner from the organization described in Rev. Rul. 76-456, 1976-2 C.B. 151, we need not evaluate the significance of the position respondent espouses therein.

In contrast to the nonpartisan activities conducted by the organization in Rev. Rul. 76-456, *supra*, respondent determined and we find that petitioner conducted its educational activities with the partisan objective of benefiting Republican candidates and entities. Petitioner was incorporated by Jan W. Baran, General Counsel of the NRCC on January 24, 1986. In April 1986, petitioner stated in its Application for Recognition of Exemption that its training program was an outgrowth of the program run by the NRCC.

Petitioner's activities have been exclusively funded by the National Republican Congressional Trust. Two of petitioner's three initial directors had significant ties to the Republican party: Joseph Gaylord as Executive Director of NRCC and John C. McDonald as a member of the Republican National Committee. Petitioner's bylaws empowered this Republican majority of the board to "have general charge of the affairs, property and assets of the Corporation." Under their general charge the academy instituted a curriculum that included studies of the "Growth of NRCC, etc." and "Why are people Republicans."

Following the reorganization of petitioner's curriculum after the 1986 election, additional partisan topics such as "Other Republican givers lists," "How some Republicans have won Black votes," and "NRCC/RNC/NRSC/State Party naughtiness" were added. The academy's curriculum failed to counterbalance the Republican party focus of these

courses with comparable studies of the Democratic or other political parties.

Petitioner does not require that its admissions panel members be affiliated with a particular political party, but believes that a substantial number of the panel members are affiliated with the Republican party. Likewise, while no particular political affiliation is required of students, the two political references solicited by petitioner on its application for admission often permit the admissions panel to deduce the applicant's political affiliation. In turn, knowledge of an applicant's political affiliation provides the admissions panel with a means of limiting enrollment to applicants who are likely to subsequently work in Republican organizations and campaigns.

Petitioner was asked by respondent to identify the affiliation of the candidates served by its graduates. Petitioner responded that although graduates are not required to remain in contact with academy following graduation, "some" graduates chose to report their whereabouts. To the "best" that petitioner could determine, these graduates served on campaigns of candidates who were predominantly affiliated with the Republican party.

The administrative record reveals that 119 of 120 graduates reported their whereabouts to petitioner. These addresses were reported by petitioner in its June 1986, monthly newsletter. The addresses of graduates working in Congressional or Senatorial campaigns contained the name of the political committee or organization of the candidate; e.g., Bruce Long for Congress, Friends of Bill Emerson, Jim Hansen Committee, People for Dio Guardi, etc. The June-September 1986, newsletters disclosed that 85 academy graduates worked in approximately 98 Congressional and Senatorial candidate campaigns. The newsletters did not, however, specify the political affiliations of the respective candidates.

The political affiliations of the candidates served by petitioner's graduates were readily available to petitioner from the public records maintained by the Federal Election Commission. See Election Campaign Act of 1971 (as amended by Pub. L. 96-187, 93 Stat. 1354), 2 U.S.C. sections 431, 433, 434 and 438 (Supp. IV 1986), which

generally require political committees authorized by a candidate to register with and disclose financial and affiliation information, including the party affiliation of the candidate, to the Federal Election Commission, which in turn must compile and index such information and make it available to the public.

As we have delineated under the heading FACTUAL BACKGROUND (p. 1055, *supra*), Federal Election Commission rules and regulations are one of the topics which petitioner's course of study explores, so petitioner would have to concede that it is peculiarly positioned to have knowledge and awareness of the ready availability of data from the Commission's public records. Accordingly, we infer that petitioner's "best determination" regarding the predominant Republican party affiliation of the candidates for whom academy graduates were working in 1986 reflects the political affiliations disclosed in the Federal Election Commission's public records.

A showing that petitioner's graduates served in Congressional and Senatorial campaigns of candidates from both major political parties in substantial numbers would have significantly aided petitioner's contention that its activities only benefited nonselect members of a charitable class. Nevertheless, petitioner did not see fit to include in the administrative record any specific example of a graduate working for a Democratic Senatorial or Congressional candidate. We cannot assume that information regarding the placement of academy graduates, not shown to be unavailable, would have been favorable to petitioner; i.e., would have reflected nonpartisan placement. In fact, the contrary is true. See *Fear v. Commissioner*, T.C. Memo. 1989-211; see also *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Consequently, it is reasonable to infer from petitioner's omission that the affiliation information, had it been included, would have revealed the Republican affiliation of the candidates.

Based upon our review of the administrative record, we find that petitioner operated to advance Republican interests. We also find that the placement of 85 of petitioner's graduates in the campaigns of 98 Republican Senatorial and Congressional candidates conferred a benefit on those candi-

dates. Petitioner's partisan purpose distinguishes the case at bar from Rev. Rul. 76-456. Likewise, petitioner's partisan purpose differs significantly from the nonpartisan educational purpose advanced by a university through means of a political science course which required each student to participate for a two-week period in the political campaign of a candidate of his or her choice. See Rev. Rul. 72-512, 1972-2 C.B. 246.

Petitioner next contends that because all educational programs inherently benefit both the student by increasing his or her skills and future earnings and the eventual employer who profits from the services of trained individuals, the educational benefits it provides should not be construed as prohibited private benefits. (Hereinafter, we will refer to the benefits conferred on the students as primary private benefits and the benefits conferred on the employers as secondary benefits.) In support of this contention, petitioner cites several revenue rulings granting exempt status to training programs and educational facilities sponsored by various industry and professional organizations.

The aforementioned revenue rulings cited by petitioner are:

Rev. Rul. 72-101, 1972-1 C.B. 144 (six-week, full-time training program created as a result of collective agreements and funded by industry employers to train individuals working or desiring to work in that industry).

Rev. Rul. 67-72, 1967-1 C.B. 125 (organization created as a result of collective bargaining and funded jointly by labor and management to conduct an industry-wide apprentice training program for interested individuals seeking to qualify for employment as journeymen anywhere in the industry).

Rev. Rul. 68-504, 1968-2 C.B. 211 (organization with a membership open to all bank employees in a particular urban area operated to conduct an educational program and publish a professional magazine).

Rev. Rul. 75-196, 1975-1 C.B. 155 (organization supported by a local bar association to maintain a law library for the use of bar association members and their designees).

Petitioner argues that the above rulings establish that organizations which restrict benefits to identified classes demarked by industrial or geographic limitations may, nonetheless, qualify as exempt if the benefited class is

broad enough to represent the community. Moreover, petitioner argues that since Republican entities and candidates arguably represent the interests of a class consisting of hundreds of organizations and millions of citizens, the benefits accruing to this class should be construed as public in nature.

Respondent does not quarrel with the notion that exempt educational organizations must inherently confer private benefits on participating individuals. Indeed, he recognizes that an educational organization exists to confer primary private benefits by instructing or training individuals for the purpose of improving or developing his or her capabilities. Sec. 1.501(c)(3)-1(d)(3)(i), Income Tax Regs. Moreover, respondent does not assert that the pool of potential students is so narrowly drawn that the academy would confer a proscribed primary private benefit. See *Bob Jones University v. United States,* 461 U.S. at 597 and cases cited therein. See also 4 A. Scott, Law of Trusts, sec. 372.2 (3d ed. 1967); *Local Union 712 v. Commissioner,* T.C. Memo. 1983-76 (45 T.C.M. 675, 678; 52 P-H Memo T.C. par. 83,076 at 83-229).

Instead, respondent objects to the secondary benefit accruing exclusively to the Republican entities and candidates who employ petitioner's skilled alumni. Respondent contends that where the training of individuals is focused on furthering a particular targeted private interest, the conferred secondary benefit ceases to be incidental to the providing organization's exempt purposes. By contrast, respondent contends that when secondary benefits are broadly distributed, they become incidental to the organization's exempt purposes.

Respondent asserts that the case at bar differs from the circumstances described in revenue rulings cited by petitioner. Significantly, respondent contends that the secondary benefit provided in each ruling was broadly spread among members of an industry (i.e., employers of union members within an industry, banks within an urban area, members and designees of a local bar association), as opposed to being earmarked for a particular organization or person. The secondary benefit in each of the cited rulings

was therefore incidental to the providing organization's exempt purpose.

Based upon his determination that petitioner targeted Republican entities and candidates to receive the secondary benefit through employing its alumni, respondent concludes that the secondary benefit provided by petitioner was not incidental and that more than an insubstantial part of petitioner's activities were performed to further a nonexempt purpose. We agree with respondent.

The question of whether a benefit is private in nature, within the meaning of 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs., was explored by this Court in *Aid to Artisans, Inc. v. Commissioner,* 71 T.C. 202, 215-216 (1978). In that case, the Commissioner asserted that the organization's purchase of handicrafts from disadvantaged artisans served the private interests of the artisans selling their works. In evaluating the merit of the Commissioner's contention, we stated that:

The questions whether an organization serves private interests within the meaning of [sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs.] and whether an organization's activities are conducted for private gain * * * may be resolved * * * by examining the definiteness and charitable nature of the class to be benefited and the overall purpose for which the organization is operated. [71 T.C. at 215.]

Upon finding that (1) the disadvantaged artisans receiving the benefits of the organization's purchases comprised a charitable class, (2) the organization's method of selecting handicrafts for purchase indicated no selectivity with regard to individual artisans to be benefited, and (3) the organization's overall purpose was to benefit disadvantaged communities, we declared the *Aid to Artisans* organization exempt. 71 T.C. at 215-216. See also *Goldsboro Art League, Inc. v. Commissioner, supra; Cleveland Creative Arts Guild v. Commissioner,* T.C. Memo. 1985-316. Compare *St. Louis Science Fiction Limited v. Commissioner,* T.C. Memo. 1985-162. Similarly, we have found that organizations which further exempt purposes through sponsoring legal or medical referral services did not confer private benefits so long as the referral service was open to a broad representation of professionals and no select group of professionals were the primary beneficiaries of the service. *Kentucky Bar Founda-*

*tion v. Commissioner, supra.* See also *Fraternal Medical Specialist Services, Inc. v. Commissioner,* T.C. Memo. 1984-644.

To prevail herein, petitioner must establish that the Republican entities and candidates benefiting from the employment of its graduates are members of a charitable class, and within that charitable class do not comprise a select group of members earmarked to receive benefits. With regard to the charitable nature of Republican entities and candidates, petitioner contends that because the Republican party is comprised of millions of individuals with like "political sympathies," benefits conferred by the academy on Republican entities and candidates should be deemed to benefit the community at large. We are not persuaded by petitioner's argument.

Petitioner cites no authority in support of its contention that size alone transforms a benefited class into a charitable class. On the contrary, we believe a qualitative as opposed to a quantitative analysis is more appropriate in assessing the charitable characteristics of a benefited class. In *Columbia Park & Recreation Association v. Commissioner,* 88 T.C. 1, 18-21 (1987), affd. without published opinion 838 F.2d 465 (4th Cir. 1988), an organization, formed to provide recreational and other benefits to a membership comprised of approximately 110,000 homeowners and tenants of a real estate development, contended that the magnitude and breath of the benefited class caused it to be inherently charitable. We were not persuaded by the recreation association's per se charitable contention. Rather, we stated that in evaluating qualified organizations:

We should not be guided merely by petitioner's size [i.e., number of benefited residents] because qualitative not quantitative factors are more determinative of the charitable purpose of an organization. The size of an organization is meaningless if it is not fully integrated with a public element. Mere size does not transform an otherwise noncharitable, private organization to a "charitable" one. [88 T.C. at 19[]]

Finding that the recreation association benefited private members, albeit 110,000, we refused to declare the organization inherently exempt based solely upon its size.

We recognize that Republican entities and candidates differ from the organization at issue in *Columbia Park.*

Nonetheless, we find the principle that size alone fails to confer charitable status applicable to the case at hand. Class size is only one factor to be considered in our qualitative analysis; it is not the sole determinant. Accordingly, petitioner must show that Republican entities and candidates possess charitable characteristics in order that the entities and candidates be deemed members of a charitable class. See section 1.501(c)(3)-1(d)(2), Income Tax Regs., for a noninclusive list of charitable characteristics: poor, distressed, underprivileged, religious, educational, scientific, etc. The large size of the Republican party, which petitioner submits is ultimately benefited by its graduates, does not diminish the need for such showing. Petitioner has not established that the specific Republican entities and candidates which benefited by its educational programs were members of a charitable class.

Moreover, even were we to find political entities and candidates to generally comprise a charitable class, petitioner would bear the burden of proving that its activities benefited the members of the class in a nonselect manner. Rule 217(c)(2)(i); *Aid to Artisans, Inc. v. Commissioner, supra.* The administrative record and the partisan affiliation of the candidates served fail to establish that petitioner broadly distributed its secondary benefits among political entities and candidates in a nonselect manner.

Petitioner contends that the infusion of competent campaign workers into the overall political system will benefit the entire community by bolstering confidence in the American electorate. We do not disagree. It is clear, however, that not all organizations which incidentally enhance the public good will be classified as "public" organizations within the meaning of section 501(c)(3). One need only glance at the other types of organizations described in section 501(c) for examples of "nonpublic" organizations which often do much to enhance the public good: private clubs, fraternal societies, veterans' organizations, labor organizations, cemetery companies, etc. *John D. Rockefeller Family Cemetery Corp. v. Commissioner,* 63 T.C. 355, 363 (1974).

We think it is significant that Congress enacted special exemption provisions for certain types of organizations

which would be unable to meet the stricter section 501(c)(3) tests which require service to public interests rather than to private ones. *John D. Rockefeller Family Cemetery Corp. v. Commissioner, supra* at 363. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. Thus, while petitioner may incidentally benefit the public, we conclude that the administrative record and the partisan affiliation of the candidates served by petitioner's graduates in the 1986 election fully support respondent's determination that petitioner confers substantial private benefits on Republican entities and candidates.

Petitioner contends that should we determine that a private benefit is conferred on Republican entities and candidates, such benefit is incidental and collateral to its primary purpose of benefiting the general public. In support of this contention, petitioner argues that a benefit which it cannot control must be incidental in nature. Petitioner observes that "while it is undoubtedly [petitioner's hope] that its alumni eventually will work for Republican organizations and candidates, Petitioner has in fact no control over whether they will do so or not." Petitioner reasons that absent an ability to control the employment of its students, it lacks the ability to control the conferral of secondary benefits attributable to such employment. Therefore, the secondary benefits conferred on Republicans are the result of happenstance and should in the opinion of petitioner be treated as merely incidental to its exempt purpose of educating campaign professionals.

Petitioner cites no compelling authority in support of its contention that nonincidental benefits must be controllable by the organization. Moreover, as discussed previously, we find the administrative record supports respondent's contention that petitioner was formed with a substantial purpose to train campaign professionals for service in Republican entities and campaigns, an activity previously conducted by NRCC. Petitioner has failed to persuade us that this is not the case. Secondary benefits which advance a substantial purpose cannot be construed as incidental to the organization's exempt educational purpose. Indeed, such a construction would cloud the focus of the operational test, which probes to ascertain the purpose towards which an organization's activities are directed and not the nature of the

activities themselves. *B.S.W. Group, Inc. v. Commissioner,* 70 T.C. at 356-357. Had the record established that the Academy's activities were nonpartisan in nature and that its graduates were not intended to primarily benefit Republicans, we would have a different case. We are not, however, deciding such a case.

Accordingly, we conclude that petitioner is operated for the benefit of private interests, a nonexempt purpose. Because more than an insubstantial part of petitioner's activities further this nonexempt purpose, petitioner has failed to establish that it operates exclusively for exempt purposes within the meaning of section 501(c)(3). Consequently, petitioner is not entitled to an exemption from taxation under section 501(a).

*Decision will be entered for the respondent.*