T.C. Memo. 2000-329

UNITED STATES TAX COURT

AT COST SERVICES, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13604-96X.                    Filed October 25, 2000.

Matthew Marion Fondel (an officer), for petitioner.

Joan Ronder Domike, for respondent.

MEMORANDUM OPINION

COHEN, Judge:  Respondent determined that At Cost Services,
Inc., does not qualify as a section 501(c)(3) charitable
organization and, therefore, is not exempt from Federal taxation
under section 501(a).  Pursuant to section 7428 and title XXI of
the Tax Court Rules of Practice and Procedure, petitioner seeks a
declaratory judgment that it is a qualified organization under

section 501(c)(3). The issue for decision is whether petitioner operates exclusively for charitable purposes. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at the time the petition was filed, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

The administrative record, which includes all of the facts upon which the Commissioner made the final adverse determination, was submitted to the Court under Rule 217(b)(1) and is incorporated herein by this reference.

Petitioner is a nonprofit Delaware corporation with its principal office located in New York, New York. The sole founder, director, and officer of petitioner is Matthew Marion Fondel (Fondel), who has a bachelor's degree in electrical engineering from Northwestern University. Before founding petitioner, Fondel worked temporary service jobs for 4 years through a number of temporary service agencies.

On Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, petitioner stated that its principal purposes are to:

(a) eliminate poverty for inner city minorities associated with long-term unemployment and under-employment and combat the racial prejudice these individuals face in the conventional work place;

(b) promote social welfare by providing a means of obtaining a lawful income to inner city minorities

and by providing them with benefits and privileges which they would enjoy if they had conventional employment (for example a health care plan, credit union, vacation pay, etc.).

(c) to reduce the burden on the federal and state governments of the current unemployment insurance system by emphasizing the placement of persons in temporary work, contract work, and self-employment as a means of keeping the individuals in the work place and as a means of reducing the cost to the government of paying unemployment insurance to these individuals until they can obtain conventional permanent employment.

Petitioner's bylaws state:

It is recognized * * * that a large segment of the population will never obtain conventional * * * employment. This corporation, At Cost Services, Inc., a publicly supported charitable organization, is then created and empowered * * * to assist the unemployed in marketing whatever skills they may possess, and to train the unemployed in skills which are marketable * * *.

Petitioner counsels and trains unemployed or underemployed individuals to become temporary service workers. Temporary service workers, as defined by petitioner, include secretaries, word processors, desktop publishers, data entry operators, general clerical workers, receptionists, and light industrial laborers. Initially, petitioner plans to teach its clients basic computer skills in demand by local businesses that historically use temporary office labor. Petitioner intends to become a "one-stop-job-center" where job training and job placement take place in the same location.

Petitioner works in conjunction with At Cost, LLC (LLC), a Delaware for-profit limited liability company whose members include Fondel and petitioner. Petitioner acts as the managing member of the LLC. Petitioner or the LLC assists clients in bidding for and finding temporary and contract work so that a client may be employed year-round through a series of temporary service jobs. Petitioner advises clients to form their own limited liability companies or become members of the LLC to create advantages for local businesses. Petitioner advertises to local businesses that those advantages include:

1. A 10-50% reduction in their costs from temporary agencies and conventional consulting firms.

2. A relationship between companies and your LLC would be business to business (as with temporary agencies and conventional consulting firms) rather than the employer/employee relationship associated with directly hiring consultants.

3. Companies can enjoy the benefits of using consultants and avoid the nightmare of having consultants they use being reclassified by the state or the IRS as employees.

The services provided by petitioner also assist local businesses by providing a source of skilled labor at reduced costs. Petitioner forgoes the normal fee charged by a temporary service agency, and the local businesses pay petitioner only the hourly rate of the client who acts as an independent contractor. Most businesses that are aided by petitioner are located in economically depressed areas.

Fondel, who does not draw a salary, performs all of the job training and job placement activities of petitioner and the LLC. At the time of the filing of the application for tax-exempt treatment, petitioner had referred about 30 people to temporary personnel agencies where they were able to obtain temporary employment. Fondel also uses petitioner and the LLC to market his own services as a temporary service worker.

Petitioner plans to create another limited liability company to publish a newsletter listing temporary employment agencies in the area and their current needs for workers. The purpose of this activity will be for referring clients when petitioner is unable to find work for them.

The primary means of support for petitioner will be from payments from clients who become members of the LLC or who create their own limited liability companies. If there is a net profit after the expenses of petitioner and the LLC are paid, it will be distributed to Fondel. A payment of 10 percent of a member's gross income earned from jobs obtained through petitioner is suggested. Petitioner will also solicit donations from nonprofit or private foundations and local businesses that have benefited from the services of petitioner. In 1995, petitioner received $1,000 from the Regis Retirement Plan, Inc., a company that petitioner helped to find a permanent employee. Petitioner will

also receive 10 percent of the gross profit from the sale of the newsletter.

Financial information included in petitioner's application for exempt status shows that it had occupancy expenses in 1994 of $6,240 and itemized expenses of $2,230. The occupancy expenses were for an apartment that served as the office of petitioner, the office of the LLC, and the personal living quarters of Fondel. Petitioner intends to obtain a building, either by lease or gift, where it can perform job training and job placement services in one location.

On April 4, 1995, petitioner submitted its Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code. Respondent issued an initial adverse determination on October 23, 1995. Petitioner appealed to the Internal Revenue Service Office of Appeals, which gave a final adverse determination on April 17, 1996, denying tax-exempt status to petitioner under section 501(c)(3). The Commissioner's reasons for denial stemmed from the determination that operations of petitioner serve the private interests of Fondel, petitioner is operated for private benefit rather than exclusively for public purposes, and petitioner has failed to establish that it is operated exclusively for exempt purposes. Petitioner challenges that determination in this action for declaratory judgment.

## Discussion

Petitioner bears the burden of proving that it is a section 501(c)(3) organization.  See Rule 217(c)(2)(A).  In order for petitioner to meet this burden, the administrative record, upon which this case is to be decided, must contain enough evidence to support a finding contrary to the grounds set forth in the notice of determination.  See Nationalist Movement v. Commissioner, 102 T.C. 558, 572 (1994), affd. 37 F.3d 216 (5th Cir. 1994); Church in Boston v. Commissioner, 71 T.C. 102, 105 (1978).  A statute creating an exemption must be strictly construed.  See American Auto. Association v. Commissioner, 19 T.C. 1146, 1158 (1953); Associated Indus. v. Commissioner, 7 T.C. 1449, 1464 (1946).

Section 501(a) provides tax-exempt status for organizations described in section 501(c).  Section 501(c)(3) includes the following organizations:

> (3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, * * * and which does not participate in, or intervene in * * * any political campaign on behalf of (or in opposition to) any candidate for public office.

Contributions to organizations described in section 501(c)(3) are generally deductible to donors.  See sec. 170(a)(1), (c)(2).

To come within the terms of section 501(c)(3), an organization must be both "organized" and "operated" exclusively for tax-exempt purposes. Sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. The presence of a single substantial nonexempt purpose precludes exempt status for the organization, regardless of the number or importance of exempt purposes. See Better Bus. Bureau v. United States, 326 U.S. 279, 283 (1945). The actual purposes of the organization, not necessarily limited to those purposes stated in the organizing documents, are the appropriate focus. See American Campaign Academy v. Commissioner, 92 T.C. 1053, 1064 (1989).

As stated in the regulations, the "operational test" is as follows:

> An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. [Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.]

Of the exempt purposes listed in section 501(c)(3), petitioner maintains that it operates for charitable purposes.

The term "charitable" is used in section 501(c)(3) in its generally accepted legal sense and includes, but is not limited to:

> Relief of the poor and distressed or of the underprivileged; advancement of religion; advancement

of education or science; erection or maintenance of public buildings, monuments, or works; lessening of the burdens of Government; and promotion of social welfare by organizations designed to accomplish any of the above purposes, or (i) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimination; (iii) to defend human and civil rights secured by law; or (iv) to combat community deterioration and juvenile delinquency. * * * [Sec. 1.501(c)(3)-1(d)(2), Income Tax Regs.]

Petitioner argues that its activities, which include job training and job placement for persons who otherwise would remain unemployed or underemployed, lessen the burdens of the unemployment and welfare systems. Petitioner maintains that its goal of creating a "one-stop-job-center" was envisioned by the Reemployment Act of 1994, S. 1951, 103d Cong., 2d Sess. (1994), and, therefore, its application for tax exemption should be treated differently than other applications for tax exemptions. Respondent claims that petitioner has not established that it operates exclusively for charitable purposes as defined in section 1.501(c)(3)-1(d)(2), Income Tax Regs.

Petitioner cites the comments of the Secretary of Labor before the Senate Finance Committee for the proposition that the Government has called on citizens to take action to help reduce the burdens of the current unemployment system. The Secretary stated:

The mismatch between the current [unemployment] system's structure and the needs it is pressed to serve burdens federal and state taxpayers, and especially businesses, with enormous costs. State unemployment

compensation payments have exceeded $13 billion in each
of the last seven years, and in 1993--even as recovery
set in--states paid out nearly $22 billion in regular
unemployment benefits.  Federal spending on
administrative costs for regular unemployment insurance
totalled $2.5 billion last year.  But unemployment
insurance is not designed to help speed workers into
reemployment.  So despite these huge outlays, the
predicament of the long-term unemployed led to the
repeated provisions of federal Emergency Unemployment
Compensation payments, costing $24 billion over the
past two years.  [Reemployment Initiative:  Hearings on
S. 1951 (Reemployment Act of 1994) Before the Senate
Comm. on Finance, 103d Cong., 2d Sess. (May 26, 1994)
(statement of Robert B. Reich, Secretary of Labor);
emphasis added.]

The activities of petitioner fall outside of the definition

of "charitable" under section 501(c)(3).  Petitioner trains

individuals to fill temporary positions as secretaries, word

processors, desktop publishers, data entry operators, general

clerical workers, receptionists, and light industrial laborers.

Petitioner also assists clients in finding a chain of temporary

jobs so that a client will have employment year-round.

Petitioner encourages clients to create an independent contractor

relationship with temporary employers by using a limited

liability company to market the services of the client.  The act

of creating a limited liability company might also prevent a

client from being labeled as an employee of petitioner.  These

activities are indistinguishable from the activities of a for-

profit temporary service agency.

The only real difference between petitioner and a for-profit temporary service agency is that petitioner does not charge local businesses the standard markup that such agencies routinely collect for services. However, this Court has held in analogous circumstances that furnishing services to local businesses at cost does not establish that an activity is charitable. See B.S.W. Group, Inc. v. Commissioner, 70 T.C. 352, 360 (1978).

In B.S.W. Group, a taxpayer's sole activity was offering consulting services at cost to nonprofit, limited resource organizations engaged in various rural-related activities. Some, but not all, of the clients of the taxpayer were other exempt organizations. Services of the taxpayer consisted of obtaining individuals to perform research projects for the clients. The individuals that were engaged received fees for their services. This Court held that the taxpayer did not operate exclusively for charitable purposes as required by section 501(c)(3) because its primary purpose was commercial rather than educational, charitable, or scientific. See B.S.W. Group, Inc. v. Commissioner, supra.

The activities of petitioner similarly constitute the conduct of a temporary service agency, which is essentially a commercial venture. Petitioner's own services or the services of its clients are in direct competition with for-profit businesses

in the temporary service field.  Petitioner is indistinguishable from the corporation in B.S.W. Group.

Furthermore, petitioner does not qualify as a section 501(c)(3) exempt organization because it benefits the private interests of its founder, Fondel, and of the LLC more than incidentally.  Petitioner submitted documents in the administrative record that state:  First, in 1994, petitioner paid $6,240 for an apartment that serves as the office of petitioner and of the LLC and as the personal residence of Fondel; second, any income of petitioner remaining after the expenses of petitioner and of the LLC are paid passes to Fondel; and, third, Fondel uses petitioner to market his own services as a temporary service worker.  These nonexempt practices prevent petitioner from qualifying as a section 501(c)(3) exempt organization.  See Better Bus. Bureau v. United States, 326 U.S. 279 (1945).  Petitioner attempted to retract these statements after the Commissioner determined that these items would preclude petitioner from qualifying as a section 501(c)(3) organization.  However, we review the administrative record in its entirety.

Citing the 13th and 14th Amendments to the Constitution, petitioner argues that respondent, in violation of petitioner's equal protection rights, denied its application for tax-exempt status because the sole founder, director, and officer of petitioner is a black male.

Besides petitioner's uncorroborated and inflammatory accusations, the record is void of any suggestion that petitioner's application for tax-exempt status was denied because petitioner's sole founder, director, and officer is a black male. Instead, based on our above analysis, we hold that the Commissioner's denial was correct and based on a determination that petitioner is not operated exclusively for exempt purposes under section 501(c)(3).

For the reasons stated, we conclude that petitioner is not operated as a section 501(c)(3) organization.  We have considered the remaining arguments of petitioner, and they either are irrelevant or otherwise lack merit.

> Decision will be entered upholding respondent's determination.