T.C. Memo. 2021-53

UNITED STATES TAX COURT

TIKAR, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14410-17X.                    Filed May 6, 2021.

<u>William James (Jim) Linzy</u> and <u>Devon S. Linzy</u>, for petitioner.

<u>Milan H. Kim</u> and <u>Jeremy H. Fetter</u>, for respondent.

MEMORANDUM OPINION

LEYDEN, <u>Special Trial Judge</u>:  After examining the activities of petitioner,

Tikar, Inc. (Tikar), the Internal Revenue Service (IRS)[1] issued a final adverse

---

[1]The Court uses the term "IRS" to refer to administrative actions taken outside of these proceedings.  The Court uses the term "respondent" to refer to the Commissioner of Internal Revenue, who is the head of the IRS and is respondent in this case, and to refer to actions taken in connection with this case.

**[\*2]** determination letter dated May 9, 2017, revoking Tikar's tax-exempt status effective as of January 1, 2012.  The IRS determined that Tikar was not operated exclusively for exempt purposes.  Tikar exhausted its administrative remedies, <u>see</u> sec. 7428(b)(2); Rule 210(c)(4),[2] and challenged the IRS' determination by timely filing a petition with the Court for a declaratory judgment, <u>see</u> sec. 7428(a), (b)(3). The sole issue for determination is whether Tikar was operated exclusively for one or more exempt purposes as set forth in section 501(c)(3).  The Court concludes it was not.

Background

The parties filed with the Court the administrative record on March 28, 2018, and a joint first stipulation of facts with attached exhibits on September 10, 2019.[3]  This case was submitted for decision without trial in accordance with Rule 217(b)(1) and (2).  <u>See also</u> Rule 122.  For purposes of this proceeding, the facts and representations in the administrative record and the first joint stipulation of

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]By order dated August 18, 2020, the Court reopened the record for the sole purpose of admitting the joint first stipulation of facts with attached exhibits.

**[*3]** facts and exhibits are accepted as true, <u>see</u> Rule 217(b)(1), and are incorporated herein by this reference.

Tikar's principal place of business was in Temple, Texas, when the petition was filed.

I.      The Seghers Collection

In 1993, after a short stay in Cameroon, Victor Seghers, a cardiologist, began developing an interest in Tikar[4] culture, including art and lifestyle, and in collecting Tikar artifacts, especially bronze objects. During 1994, 1995, and 1996 Dr. Seghers imported African artifacts[5] through the ports of Houston and Dallas, Texas. Additionally, the administrative record includes 173 pages of "shipping documents" ranging in dates from 2001 to 2015 showing that objects such as "handicrafts", "statues", and bronzes were shipped from Cameroon to Belgium, purportedly for Dr. Seghers.

---

[4]Tikar was one of the tribes in Cameroon when it was controlled by Belgium in the 19th and 20th centuries.

[5]The record includes references to "African artifacts", which include artifacts from Benin, Tikar, and several other African cultures. Hereinafter references to African artifacts are references to the artifacts from these cultures. The Court uses Tikar artifacts to refer to artifacts from that particular culture.

**[*4]** A.     Dr. Seghers' African Artifacts

To assist with the collection, movement, and display of the African artifacts, Dr. Seghers engaged the services of Emmanuel Mbiam, an attorney in Cameroon. However, a portion of the African artifacts Dr. Seghers had purchased remained in Africa with Mr. Mbiam. In 2005 Dr. Seghers hired an attorney, Ronald J. Kormanik, to reclaim these African artifacts. With assistance from Mr. Kormanik, Dr. Seghers transferred the African artifacts in Mr. Mbiam's possession to the basement of the National Museum in Cameroon.[6]

B.     J.F. Seghers Foundation

Sometime in 1996 Dr. Seghers' father, Conrad Seghers, created the J.F. Seghers Foundation (Seghers Foundation) in the Principality of Liechtenstein for the purpose of "the promotion of African Art from Cameroon by establishing museums, organizing exhibits, [and] sale of art in favour of other entities with the same object, etc." The collection of Tikar artifacts owned by the Seghers

---

[6]An inventory dated September 2007 titled "Inventory of African Art Objects Conserved at the National Museum" was prepared with respect to these African artifacts. According to the inventory, the African artifacts that were transferred to the National Museum were piled in disorder and without protection causing many objects to become damaged. The inventory listed objects and classified them to give clear statistics on the African artifacts stored at the National Museum.

[*5] Foundation and by Dr. Seghers is collectively referred to as the Seghers Collection.

On May 3, 1996, the University of Yaoundé, School of Arts, Letters, and Humanities in Yaoundé, Cameroon, signed a Cooperation Agreement with The African Art Protection and Promotion Association and the Seghers Foundation for the purpose of:  (a) researching and documenting African arts; (b) conducting anthropological studies and collection conservation; (c) researching and publishing scientific works; (d) creating expert reports on works of art; and (e) organizing art focused symposia.

C.     American Black Cardiologists Exhibit

On August 9, 1996, Dr. Seghers, as the president of the Seghers Foundation, participated in a program for the opening of the Museum of Tikar Art[7] at the office of the Association of Black Cardiologists, Inc. (ABC), which was to display 100 pieces of the Seghers Collection.  In an agreement dated December 20, 1996, Dr. Seghers, as an art collector, allowed ABC the right to exhibit in the United States some of artifacts in the Seghers Collection.  They were to be displayed under the

---

[7]However, from late 1998 to 1999, further funding for the Museum of Tikar Art was not secured, and most of the African artifacts were returned to Dr. Seghers with only a few major pieces remaining with ABC.  These last pieces were returned to Dr. Seghers during 2015 and stored in the warehouse in Temple, Texas, where the other African artifacts were stored.

[*6] auspices of ABC, which would have at least 100 pieces as a permanent display. Under the agreement Dr. Seghers retained the right to exhibit some of the African artifacts in any venue he chose and to sell any part of the ABC display at his own discretion.[8] The agreement between Dr. Seghers and ABC also provided that ABC would receive 15% of gross receipts if ABC identified a buyer for a displayed Seghers Collection African artifact or was otherwise involved in the sale of such artifact, and 5% of the gross receipts if ABC played no part in the sale.

## II.    Tikar

Tikar was organized as a Texas nonprofit corporation on May 14, 1999. Tikar's initial directors were Dr. Seghers, Conrad Seghers, and William James (Jim) Linzy.[9] According to Tikar's articles of incorporation, signed April 27, 1999, Tikar was organized "[t]o present expositions of objects belonging to the corporation. To negotiate contracts with Museums and other organizations to organize expositions. To promote African Art by exhibits through the corporation itself or through museums. To do any and all necessary and incidental to the

---

[8]If the ABC exhibit fell below 100 pieces, Dr. Seghers was required to replace the exhibit with African artifacts in the Seghers Collection.

[9]William James Linzy is sometimes referred to as "Jim" Linzy in the administrative record.

[*7] stated purpose but in no * * * [way] in violation of Section 501(c)(3) of the Internal Revenue Code."

III.    Tikar's Application for Recognition of Tax-Exempt Status

On April 30, 1999, the IRS received Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, submitted by Tikar.[10]  Tikar listed its activities as "[t]o present expositions of objects belonging to the corporation.  To negotiate contracts with Museums and other organizations to organize expositions.  To promote African Art by exhibits through the corporation itself or through museums."  Tikar described its fundraising program as:  "[p]rivate exposition open to the public, sales for the benefit of other organizations with the same objective, publications of articles as well as textbooks and films."

The Form 1023 listed Tikar's sources of financial support as "[c]ontributions from Museums, corporations and general public."  On the Form 1023, Part IV, Financial Data, A. Statement of Revenue and Expenses, Tikar reported revenue of $25 million and $5 million for "Gifts, grants, and

---

[10]The Form 1023 submitted by Tikar was the revised September 1998 version.  On the Form 1023 Tikar listed the date incorporated as July 12, 1995. This is inconsistent with May 14, 1999, the date its articles of incorporation were filed with the Texas secretary of state.

[*8] contributions received" for tax years 1999 and 2000, respectively. Tikar also reported expenses of $15 million for "Contributions, gifts, grants, and similar amounts paid" and "Amounts dist. to museums" and $10 million for "Cost of Acquisition" for tax year 1999.

On the Form 1023, Part IV, Financial Data, B. Balance Sheet, Tikar listed as assets on line 7, "Other investments", "African Art" with a value of $15 million. The form did not include a date after the column heading "Current tax year Date ___."

On the Form 1023 Tikar reported it had "artifacts and pieces of art of African culture" that it used in the performance of its exempt function with a value of $15 million. Question 12a on Form 1023, Part II, Activities and Operational Information, asks: "If the organization provides benefits, services, or products, are the recipients required, or will they be required, to pay for them?" Tikar answered "Yes" and provided the following explanation: "Museums that purchase the art will be required to reimburse for the costs associated with obtaining the art. If the corporation has art exhibits, costs will be passed on to the viewing public in the form of admittance fees". Tikar's governing body was listed on Form 1023 as Dr. Seghers as president, Conrad Seghers as vice president, and Mr. Linzy as secretary.

[*9]   In a letter dated July 19, 1999, the IRS requested the following additional information from Tikar:  (1) a copy of its articles of incorporation, (2) confirmation that the items to be exhibited are currently owned by the organization and whether they were donated and by whom, and (3) an explanation as to why the sale of exhibited items would not result in a private benefit being bestowed on the individual artists and the organization.

By letter dated August 4, 1999, Tikar submitted a copy of its articles of incorporation and provided the following responses:

> 2.      Items are owned by the corporation.  They were not donated.
>
> 3.      Several private institutions which include the University of Yaoundé in Cameroon acquired these objects by purchasing them from native tribes in Cameroon.  The organization intends to reimburse these institutions for their costs in acquiring these objects. The remainder of the funds will be used for charitable purposes of the organization. * * * [Mr. Linzy] do[es] not believe this requires any IRS precedent.

The administrative record includes two unexecuted agreements purporting to show that in 1999 Dr. Seghers sold his collection of African artifacts to the Rivus Trust Reg. of FL 9490 Vaduz, Principality of Liechtenstein (Rivus Trust) for $20 million and then, in a separate agreement, the Rivus Trust sold the African artifacts to Tikar for $20 million.  The agreements included signature lines for Friedrich Wohlmacher on behalf of Rivus Trust, the only board member and

[*10] trustee of Rivus Trust, and Dr. Seghers in his individual capacity for the first agreement and on behalf of Tikar for the second agreement. The record does not include signed copies of these agreements.

The agreements referred to schedule "A" for the African artifacts that were sold, but the administrative record does not include a copy of schedule "A". Mr. Wohlmacher stated in an email that the amount the Rivus Trust paid for African artifacts was close to $800,000, not $20 million. The administrative record does not include any signed documents that show the transfer of African artifacts from the Seghers Foundation to the Rivus Trust or from the Rivus Trust to Tikar.

The IRS sent another letter, dated August 23, 1999, requesting that Tikar "[p]rovide a statement that all titles, ownerships, copyrights, royalties or similar interests in articles, textbooks, and films or other materials purchased and/or prepared for your activities and/or organization will be held by your organization" and "indicate: what is to be sold, to whom, how the proceeds will be used, and why no inurement or private benefit will result from these transactions."

On August 31, 1999, Tikar submitted a statement signed by three officers, which stated, "[a]ll titles, ownership, copyrights, royalties or similar interest in articles, textbooks, and films or other materials acquired by Tikar, Inc. will be held by the organization for the purpose of promoting African Art by exhibits through

[*11] the corporation itself or through museums." The statement is not notarized or signed under penalties of perjury. Tikar also provided the following explanation:

> The organization plans from time to time to have exhibits of the art. This will just be treated as any other type of museum exhibits. Tickets will be sold to view the exhibition. Also [it is assumed that] t-shirts, knick-knacks, and books about the artifacts and the history of the artifacts in the exhibition will be sold. Proceeds will be used to finance the exhibition itself and then used exclusively to fund other exhibitions and to acquire artifacts to further the purpose of the organization. Therefore no private benefit will result in these transactions as all of the proceeds after expenses will be used for the sole purpose of the organization.

On September 8, 1999, the IRS issued a determination letter stating that on the basis of the information supplied, and assuming Tikar's operations would be as stated in the application for recognition of exemption, the IRS had determined that Tikar was exempt from Federal income tax under section 501(a) as an organization described in section 501(c)(3). The letter stated the IRS was not making a final determination of Tikar's foundation status under section 509(a) and Tikar would be treated as a publicly supported organization, and not as a private foundation, during the advance ruling period. The advance ruling period began May 14, 1999, and ended December 31, 2003.

[*12] IV.     Advance Ruling Period and Private Foundation Determination

On December 17, 2003, Tikar sent a letter to the IRS and enclosed Form 8734, Support Schedule For Advance Ruling Period.  In its letter Tikar stated there had not been any activity for the past few years.  Tikar explained that it intended to sell some of the African artifacts to museums in the United States and use those funds to cover their purchase prices.  Tikar stated that over the past five years it had been negotiating with a museum to display the African artifacts.  The museum would provide funds to Tikar in exchange for showing some of the African artifacts.  However, the authenticity of the African artifacts was in question, and Tikar was working with experts from Cameroon, Germany, and the Smithsonian to determine their authenticity.  Tikar stated that there would not be any activity for the next several years until the Smithsonian determined the authenticity of the African artifacts.  On the Form 8734 Tikar reported it had received zero in financial support for the past five years.

By letter dated February 20, 2004, the IRS informed Tikar that on the basis of it not receiving any public support during the advance ruling period, the IRS determined that Tikar did not qualify as a public charity and instead would be classified as a private foundation under section 509(a).  Tikar was instructed to file Form 990-PF, Return of Private Foundation or Section 4947(a)(1) Nonexempt

[*13] Charitable Trust Treated as a Private Foundation, beginning with the period ending December 31, 2004. The letter also stated that Tikar's exemption under section 501(c)(3) remained in effect.

## V.    Activities With Respect to the Seghers Collection

In a Professional Service Agreement, dated August 3, 2005, between American Archaeology Group, LLC (AAG), a Texas limited liability company, and Tikar, AAG agreed to provide professional archaeological and museum consulting services with regard to the Seghers Collection that was then housed in Temple, Texas. Specifically, AAG agreed to provide "project management over the collection, inventory, documentation, database development, provide litigation support, conduct research necessary to prove the authenticity and relative age determinations of the collection, and publish the results of the Tikar project." Michael R. Bradle, the president of AAG, was designated to fulfill the obligations under this contract.

In exchange for AAG's services, it was "assigned a ten percent (10%) undivided interest in the entire * * * [Seghers Collection] housed in Temple, Bell County, Texas, and in Cameroon, West Africa". Additionally, "[a]ny funds received from the sale of any portion of the * * * [Sehgers Collection] must be put into an escrow account and distributed proportionately by an attorney selected by

[*14] the owners of the collection. Any funds received by Tikar with respect to any exhibit fees, licensing, copyrights, trademarks, memorabilia sales, book sales, etc., shall be paid to AAG * * * its proportional ten percent".

Tikar also engaged the services of Mr. Linzy as legal counsel in August 2005. In an agreement between Tikar and "Jim Linzy, Ltd.", a "five percent (5%) undivided interest in the entire * * * [Seghers Collection] housed in Temple, Bell County, Texas, and in Cameron, Texas [sic]" was given to Jim Linzy, Ltd., as a fee for providing professional legal services to Tikar. The agreement additionally provided that "[a]ny funds received from the sale of any portion of the * * * [Seghers Collection] must be put into an escrow account and distributed proportionately by an attorney selected by the owners of the collection. Any funds received by Tikar with respect to any exhibit fees, licensing, copyrights, trademarks, memorabilia sales, book sales, etc., shall be paid to * * * [Jim Linzy, Ltd.] its proportional five percent".

An agreement was executed in 2005 between Mr. Kormanik and Dr. Seghers as an authorized agent of Tikar to bring a lawsuit against Mr. Mbiam to acquire and capture the "art collection" in Mr. Mbiam's control. Pursuant to that agreement, Mr. Kormanik was paid an hourly rate and given a 2.5% interest in the "art collection" in exchange for ongoing professional services.

[*15] VI.    <u>Mr. Bradle's Work</u>

Mr. Bradle received reimbursement from Tikar in 2005 of an unspecified amount for "workers and supplies during the initial unpacking and cataloging", in 2010 of approximately $10,000 to cover expenses for a trip to Cameroon,[11] and in 2015 by two checks for unspecified amounts to cover two expeditions and his time.

On November 15, 2012, Mr. Bradle sent an email describing two proposed trips. The first trip included traveling to Nigeria and then to Cameroon to finalize an inventory and assign cultural affiliation to the art. Mr. Bradle planned to hire people to help photodocument each object to finalize a rough inventory that was adequate for sale purposes. Mr. Bradle anticipated this trip would take 15 days or less with an estimated budget of $37,450.

The second trip proposed by Mr. Bradle included traveling to Cameroon to conduct fieldwork and then to London to deliver samples to metallurgy laboratories and meet with experts. Mr. Bradle did not provide an estimated

---

[11]From January 14 through 19, 2010, a mission of archaeological research was carried out in the geographical area occupied by the Tikar people, and a report was completed in January 2010. The mission of the January 2010 project was an initial phase of work attempting to document the collection of the African artifacts preserved in Texas and Cameroon. Mr. Bradle was involved with this project.

**[*16]** length of time for the second trip, but the proposed budget included hotel and accommodations for 100 days and estimated a total trip cost of $115,300.

In an email dated November 24, 2012, from Mr. Bradle to Dr. Seghers and Mr. Linzy, Mr. Bradle stated he "would like to contact several major museums in Los Angeles, Chicago, New York, Washington DC[,] and Miami" to make arrangements to provide 40 or more African artifacts to put on an exhibit. Mr. Bradle stated that this would assist in the sale of the African artifacts because it would draw attention to this culture and he would let the museums know the entire collection was for sale. Mr. Bradle suggested he could do the same in Yaoundé and Nigeria. However, the administrative record does not include evidence that Mr. Bradle contacted any museums or made arrangements for the African artifacts to be exhibited.

On February 25, 2016, Mr. Bradle sent Mr. Linzy an email and wrote: "[Dr. Seghers] has been pressuring me for years that he thinks any and everything needs to be done for the same 10% ownership but that's not what the contracts says. I finally convinced him for 2015 that this was all new work" which was separate from the services provided for in the agreement between Tikar and AAG.

[*17] VII.    Tikar's Forms 990-F

    A.    2011

On its 2011 Form 990-PF Tikar reported "Contributions, gifts, grants, etc., received" of $120,960 contributed by Dr. Seghers and "Other expenses" of $101,574 consisting of $50,000 of "Archaeology Fees", $75 of "Bank Charges", $51,500 of "Archaeology Expedition Expense", and -$1 of "Cash Over".  On the 2011 Form 990-PF Tikar also reported a mortgage of $25 million payable to "Seghers Foundation".

On the 2011 Form 990-PF, Part IX-A, Summary of Direct Charitable Activities, Tikar wrote "travel to Cameroon to find kiln sites and work with the University to document dates of origin" as its largest charitable activity and reported zero of expenses associated with this activity.

Tikar reported the book value for the "Inventories for sale or use" as $25,040,000 and "Mortgages and other notes payable" of $25 million.  The administrative record does not include any evidence to support these reported amounts.  On the 2011 Form 990-PF, Part VIII, Information About Officers, Directors, Trustees, Foundation Managers, Highly Paid Employees, and Contractors, Tikar listed Dr. Seghers as the president and Mr. Linzy as the vice president with average hours per week devoted to these positions as zero for both

[*18] individuals.  On the 2011 Form 990-PF, Schedule B, Schedule of Contributors, Dr. Seghers is listed as the sole contributor.

B.  2012

On its 2012 Form 990-PF Tikar reported total revenue of $100,018, consisting of $100,000 for "Contributions, gifts, grants, etc., received" and $18 of "Interest on savings and temporary cash investments", and reported $182,927 of "Total operating and administrative expenses", consisting of $180,101 for "Other expenses" and $2,826 for "Legal fees".  The "Other expenses" consisted of: (1) $150,000 for "Archaeology fees"; (2) $100 for "Bank Charges"; (3) $30,000 for "Archaeology Expedition Expense"; and (4) $1 for "Cash Short".

On the 2012 Form 990-PF Tikar reported $25,040,000 as the book value for the "Inventories for sale or use" and "Mortgages and other notes payable" of $25 million.  The administrative record does not include any evidence to support these reported amounts.  On the 2012 Form 990-PF Part VIII, Information About Officers, Directors, Trustees, Foundation Managers, Highly Paid Employees, and Contractors, Tikar listed Dr. Seghers as the president and Jim Linzy as the vice president with average hours per week devoted to these positions as zero for both individuals.  The 2012 Form 990-PF, Schedule B, Schedule of Contributors, Part I,

[*19] Contributors, listed Dr. Seghers as the sole contributor with total contributions of $100,000.

On the 2012 Form 990-PF, Part IX-A, Summary of Direct Charitable Activities, Tikar listed "travel to Cameroon to find Kiln sites and work with the University to document dates of origin" and reported zero of expenses associated with this activity.

C.   2013

On its 2013 Form 990-PF Tikar reported total revenue of $100,007, consisting of $100,000 for "Contributions, gifts, grants, etc., received" and $7 of "Interest on savings and temporary cash investments", and reported $104,012 of "Total operating and administrative expenses", consisting of $81,040 for "Other expenses" and $22,972 for "Legal fees".  The $81,040 of "Other expenses" consisted of:  (1) $75,025 for "Archaeology Fees"; (2) $50 for "Bank Charges"; and (3) $5,965 for "Property Taxes".

On the 2013 Form 990-PF Tikar reported a mortgage or other notes payable of $25 million and "Inventories for sale or use" of $25,040,000.  The administrative record does not include any evidence to support these reported amounts.  On the 2013 Form 990-PF, Part IX-A, Summary of Direct Charitable Activities, Tikar listed "travel to Cameroon to find kiln sites and work with the

[*20] University to document dates of origin" and reported zero of expenses associated with this activity.

The 2013 Form 990-PF, Part VIII, Information About Officers, Directors, Trustees, Foundation Managers, Highly Paid Employees, and Contractors, listed Dr. Seghers as the president and Mr. Linzy as the vice president with average hours per week devoted to these positions as zero for both individuals. The 2013 Form 990-PF, Schedule B, Schedule of Contributors, Part I, Contributors, listed Dr. Seghers as the sole contributor with total contributions of $100,000.

## VIII. IRS Examination of Tikar's Return

By letter dated May 14, 2015, the IRS informed Tikar that its 2012 Form 990-PF had been selected for an audit and requested information from Tikar including the history of the organization; a description of the organization's activities; copies of minutes for 2012; an explanation of the organization's sources of income; a list of contributors for 2012; any pamphlets, brochures, newsletters, and literature about the organization; and information about any artwork donated to the organization.

On May 28, 2015, Tikar submitted some of the information requested. Tikar provided a one-page history of its organization that identified its activities from 1999 to 2010, consisting largely of when the elected officers changed, when

[*21] the registered agent with the secretary of state changed, and a January 21, 2009, special meeting minutes to approve a trip to Cameroon.[12]

In a subsequent letter dated June 16, 2015, Tikar provided information about its president, Dr. Seghers, and his interest in preserving the Benin and Tikar cultures by purchasing bronzes found in Africa. The letter explained that Dr. Seghers had spent approximately $20 million of his family's money and preserved these African artifacts in warehouses in Temple, Texas. This letter further stated that an exhibit of certain pieces of the Seghers Collection was displayed in Atlanta, Georgia, with ABC and in Cameroon. Tikar indicated that the Seghers Collection was not insured because no insurance company can value it but estimated that a reasonable value for the collection was between $25 million and $50 million.

An audit appointment was held on August 3, 2015, at Tikar's place of business. The IRS in a followup letter dated August 10, 2015,[13] requested additional information, including a copy of the loan agreement for the $25 million

---

[12]According to the minutes of special meeting of the board of directors of Tikar, Mr. Bradle was authorized to be reimbursed for expenses incurred during an upcoming trip to Cameroon, including the cost of a bede (interpreter and guide).

[13]The IRS sent the same letter again to Tikar on August 27, 2015. In a letter, dated August 31, 2015, Tikar stated that it did not receive the first letter the IRS sent.

**[\*22]** mortgage or note payable to Tikar, an explanation of four wire transfers during 2012, receipts for archaeology fees reported as paid on Form 990-PF for 2012, information regarding the method Tikar used to value the Seghers Collection, information about the relationship between Tikar and the Seghers Foundation, a copy of the agreement to display a portion of the Seghers Collection in Atlanta, Georgia, and any future plans of Tikar.

Tikar provided two letters of authorization to transfer funds or securities (authorization letter) from an account at Wells Fargo to two individuals. The first authorization letter authorized funds to be transferred on a "when needed" basis in an amount "not to exceed $100,000" to "Tapche Nsangou Ahmadou" who Tikar described as an individual in Cameroon whose responsibility was to purchase African artifacts for Dr. Seghers.[14] The second authorization letter authorized

---

[14]The administrative record does not include any contract or agreement with "Tapache Ahmadou". Therefore, it is unclear what Mr. Ahmadou's relationship is with Tikar. However, Tikar described Mr. Ahmadou as an individual in Cameroon whose purpose was to purchase African artifacts for Dr. Seghers. Additionally, Mr. Bradle described Mr. Ahmadou as "the personal collector for * * * [Dr. Seghers]". Further, some of the shipping documents as well as other documents in the administrative record bear the name "Mr. Ahmadou Nsangou", with various different spellings of that name. The parties have not indicated whether this is the Mr. Ahmadou mentioned elsewhere in the administrative record and the parties' respective briefs. The parties have also not explained whether this has any impact on their other arguments.

**[*23]** funds to be transferred on December 18, 2012, of $100,000 to AAG. Tikar's bank statements showed four wire transfers in 2012 totalling $180,000.

In a subsequent information document request dated March 10, 2016, the IRS requested, among other things, a copy of the signed agreement that executed or assigned the mortgage or other note payable of $25 million to Tikar, a signed copy of the bill of sale for the African artifacts, and the signed agreement between Dr. Seghers or the Rivus Trust and Tikar donating the African artifacts to Tikar and assigning the mortgage or note for the purchase of the artifacts to Tikar. The administrative record does not include any response by Tikar.

On June 7, 2016, the IRS sent to Tikar a letter proposing to revoke its status as an organization described in section 501(c)(3) effective December 31, 2012, because "[i]n excess of 20 years of operation the foundation claims to have had only one exhibition of 2 to 3 years in duration . . . . One exhibit of 2 to 3 years does not qualify as carrying out an exempt purpose for 20 plus years of operations." Additionally, the other activities Tikar stated it was paying for, such as carbon dating, do not further Tikar's stated exempt purpose of supplying African artifacts to museums in the United States and possibly Europe. The letter gave Tikar 30 days to protest the proposed revocation to the IRS Appeals Office.

[*24] Tikar submitted a formal protest dated July 14, 2016,[15] arguing that the "activity of carbon testing to authenticate the educational item to be furnished to the Museums is an activity which accomplishes the exempt purpose to provide these artifacts to a Museum for educational purposes." Tikar also signed a Form 872, Consent to Extend the Time to Assess Tax, on August 31, 2016, to extend the time to assess tax to June 6, 2018.

Tikar's formal protest was assigned to George Poskitt in the IRS Appeals Office. In a letter dated November 29, 2016, Mr. Poskitt scheduled a conference for December 13, 2016. In anticipation of the conference Tikar submitted an explanation, pictures, and articles to document its activities.

Mr. Poskitt sent a letter dated December 13, 2016, to Tikar after the scheduled conference asking for additional information. Among other things and, in particular, the letter identified Mr. Poskitt's concerns regarding the ownership of the African artifacts. Mr. Poskitt noted that Tikar had provided only unsigned and undated draft agreements as support that the "artwork" was transferred to Tikar. Mr. Poskitt stated that his "concern is that rightful ownership of these

---

[15]Tikar provided a letter dated June 20, 2016, in response to the IRS' June 7, 2016, letter. However, Tikar's letter did not include the items required in a formal protest and the IRS requested that Tikar make specific changes to its letter to make a formal protest to the IRS Appeals Office.

[*25] works of art has not been transferred to Tikar, but still resides with Dr. Victor Seghers. This means that any benefit from the authentication, exhibition or carbon dating of these works would reside with Dr. Seghers and not Tikar." Mr. Poskitt requested that Tikar provide original documents proving ownership of the African artifacts or the Seghers Collection.

Mr. Poskitt also raised concerns about the ownership interests in Tikar that it gave to Mr. Kormanik, Mr. Bradle, and Mr. Linzy and its failure to demonstrate that any expenditures furthered its exempt purpose. Mr. Poskitt explained that "[a]n exempt organization is not a for profit entity. It cannot bargain or sell an interest in the entity."

IX. The IRS' Final Adverse Determination

The IRS Appeals Office issued a final adverse determination dated May 9, 2017, and determined that Tikar was not operated exclusively for exempt purposes. The letter stated: "Under Treasury Reg. § 1.501(c)(3)-1(c)(1), an organization will be regarded as operated exclusively for one or more exempt purposes only if it engages primarily in activities which accomplish one or more such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance

**[*26]** of an exempt purpose." The letter informed Tikar that its recognition of exemption under section 501(c)(3) was being revoked as of January 1, 2012.

## Discussion

Section 7428(a)(1)(A) confers jurisdiction on the Court to make a declaration in a case of actual controversy involving a determination by the IRS with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a). The flush text of section 7428(a) provides in pertinent part that "a determination with respect to a continuing qualification * * * includes any revocation of or other change in a qualification".

Tikar bears the burden of establishing that respondent's determination is erroneous. See Rule 142(a); Partners in Charity, Inc. v. Commissioner, 141 T.C. 151, 162 (2013). The parties submitted this case without a trial under Rule 122, and thus the evidentiary record consists solely of the administrative record and the stipulation of facts. See Rule 217(b)(1) and (2).

## I.    General Rules--Exempt Status

Section 501(a) exempts from Federal income taxation organizations described in section 501(c). Among the organizations so described are those set forth in section 501(c)(3):

[*27] Corporations * * * organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition * * * , or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual * * *

In order to be exempt under section 501(c)(3), an organization must be both organized exclusively for one or more of the exempt purposes specified in the section, known as the organizational test, and operated exclusively for such purposes, known as the operational test. See sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. Failure to satisfy either test forecloses a section 501(c)(3) exemption. Id. In the instant case the IRS' sole basis for revoking Tikar's exempt status is its determination that Tikar was not operated exclusively for an exempt purpose.

In application of the operational test, "exclusively" does not mean "solely" or "absolutely without exception". Nationalist Movement v. Commissioner, 102 T.C. 558, 576 (1994) (quoting Church in Bos. v. Commissioner, 71 T.C. 102, 107 (1978)), aff'd, 37 F.3d 216 (5th Cir. 1994); see also Copyright Clearance Ctr., Inc. v. Commissioner, 79 T.C. 793, 803-804 (1982). Nonetheless, the presence of a single nonexempt purpose, if substantial, precludes exempt status regardless of the number or importance of truly exempt purposes. Better Bus. Bureau of Wash., D.C. v. United States, 326 U.S. 279, 283 (1945); Redlands Surgical Servs. v.

**[\*28]** <u>Commissioner</u>, 113 T.C. 47, 71-72 (1999), <u>aff'd</u>, 242 F.3d 904 (9th Cir. 2001); <u>Nationalist Movement v. Commissioner</u>, 102 T.C. at 576; <u>Am. Campaign Acad. v. Commissioner</u>, 92 T.C. 1053, 1065 (1989).

> With respect to the operational test:
>
> An organization will be regarded as operated exclusively for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.

The operational test also reinforces the express dictates of section 501(c)(3) in that an entity is deemed not to operate exclusively for exempt purposes if net earnings are distributed or otherwise inure to the benefit of private individuals. <u>Id.</u> subparas. (2) and (3). Additionally, although an organization may be engaged in only a single activity directed toward multiple purposes, both exempt and nonexempt, failure to satisfy the operational test will result if any nonexempt purpose is substantial. <u>Redlands Surgical Servs. v. Commissioner</u>, 113 T.C. at 71; <u>Copyright Clearance Ctr., Inc. v. Commissioner</u>, 79 T.C. at 803-804.

[*29] Exempt purposes, in turn, are those specified in section 501(c)(3), such as religious, charitable, scientific, and educational. Sec. 1.501(c)(3)-1(d)(1)(I), Income Tax Regs. Charitable is further defined by the regulations as follows:

> The term charitable is used in section 501(c)(3) in its generally accepted legal sense and is, therefore, not to be construed as limited by the separate enumeration in section 501(c)(3) of other tax-exempt purposes which may fall within the broad outlines of charity as developed by judicial decisions. Such term includes: Relief of the poor and distressed or of the underprivileged; advancement of religion; advancement of education or science; erection or maintenance of public buildings, monuments, or works; lessening of the burdens of Government; and promotion of social welfare by organizations designed to accomplish any of the above purposes, or (I) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimination; (iii) to defend human and civil rights secured by law; or (iv) to combat community deterioration and juvenile delinquency. * * *

Id. subpara. (2).

Educational is similarly expounded: "The term educational, as used in section 501(c)(3), relates to: (a) The instruction or training of the individual for the purpose of improving or developing his capabilities; or (b) The instruction of the public on subjects useful to the individual and beneficial to the community." Id. subpara. (3)(I).

However, regardless of the presence of what might otherwise be proper exempt purposes, an explicit exception to section 501(c)(3) status exists in that

**[*30]** [a]n organization is not organized or operated exclusively for one or more of the purposes specified in * * * [section 501(c)(3)] unless it serves a public rather than a private interest.  Thus, * * * it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests.

Id. subpara. (1)(ii).

In other words, if an organization can be shown to benefit private interests, a limitation substantially overlapping but encompassing more than simply the inurement of earnings to insiders, it will be deemed to further a nonexempt purpose.  Am. Campaign Acad. v. Commissioner, 92 T.C. at 1066, 1068-1069; Church of the Transfiguring Spirit, Inc. v. Commissioner, 76 T.C. 1, 5 n.5 (1981). Private benefits within the scope of the prohibition may include an advantage, profit, fruit, privilege, gain, or interest.  Am. Campaign Acad. v. Commissioner, 92 T.C. at 1065-1066.

A substantial body of caselaw has explored the concept of private benefit within the framework of the relationship between an organization claiming tax-exempt status and its founder (or small group of related insiders).  See, e.g., Founding Church of Scientology v. United States, 412 F.2d 1197, 1199-1202 (Ct. Cl. 1969); Church of Eternal Life & Liberty, Inc. v. Commissioner, 86 T.C. 916,

**[\*31]** 927-928 (1986); Church of the Transfiguring Spirit, Inc. v. Commissioner, 76 T.C. at 5-6; Basic Bible Church v. Commissioner, 74 T.C. 846, 856-858 (1980), aff'd per curiam sub nom. Kile v. Commissioner, 739 F.2d 265 (7th Cir. 1984); Bubbling Well Church of Universal Love, Inc. v. Commissioner, 74 T.C. 531, 534-538 (1980), aff'd, 670 F.2d 104 (9th Cir. 1981); Unitary Mission Church of Long Island v. Commissioner, 74 T.C. 507, 512-515 (1980), aff'd without published opinion, 647 F.2d 163 (2d Cir. 1981).

Factors emerging repeatedly as indicative of prohibited inurement and private benefit include control by the founder over the entity's funds, assets, and disbursements; use of entity money for personal expenses; payment of salary or rent to the founder without any accompanying evidence or analysis of the reasonableness of the amounts; and purported loans to the founder showing a ready private source of credit. See, e.g., Founding Church of Scientology, 412 F.2d at 1200-1202; Church of Eternal Life & Liberty, Inc. v. Commissioner, 86 T.C. at 927-928; Church of the Transfiguring Spirit, Inc. v. Commissioner, 76 T.C. at 5-6; Basic Bible Church v. Commissioner, 74 T.C. at 857-858; Bubbling Well Church of Universal Love, Inc. v. Commissioner, 74 T.C. at 534-538; Unitary Mission Church v. Commissioner, 74 T.C. at 513-515. As this Court has noted, such circumstances provide "an obvious opportunity for abuse of the claimed

[*32] tax-exempt status" and make incumbent "open and candid disclosure of all facts"; otherwise, "the logical inference is that the facts, if disclosed, would show that petitioner fails to meet the requirements of section 501(c)(3)." Bubbling Well Church of Universal Love, Inc. v. Commissioner, 74 T.C. at 535; see also, e.g., Founding Church of Scientology, 412 F.2d at 1201; Basic Bible Church v. Commissioner, 74 T.C. at 858.

Upon a conclusion that the relevant facts reveal private benefit, the organization will not qualify as operating primarily for exempt purposes "absent a showing that no more than an insubstantial part of its activities further the private interests or any other nonexempt purposes." Am. Campaign Acad. v. Commissioner, 92 T.C. at 1066.

The IRS determined that Tikar did not operate exclusively for exempt purposes. Respondent maintains that Tikar has been largely inactive since 2012, that it has been unable to substantiate that it purchased any African artifacts, including the Seghers Collection, and that any activities associated with authenticating the African artifacts in 2012 or thereafter did not further its exempt purposes.

**[*33]** II.     Tikar's Arguments

Tikar's primary argument is that respondent erred in revoking its tax-exempt status because it has engaged in activities that accomplish its purpose, which Tikar describes as presenting and organizing expositions and promoting African artifacts by exhibiting them through the corporation itself and through museums.  Specifically, Tikar argues that (1) it displayed African artifacts both nationally and internationally to educate people worldwide about the Tikar culture and (2) it spent significant funds to authenticate additional artifacts to continue its educational purpose.

III.     Tikar Not Operated Exclusively for Exempt Purpose

Tikar has not proven that it served a public interest and, therefore, it was not operated for an exempt purpose.  On the basis of administrative record the Court concludes that Tikar was not operated for an exempt purpose because it has not proven (1) that it owned the African artifacts or the Seghers Collection and (2) that all of its activities with respect to those artifacts primarily benefit the private interest of Dr. Seghers or the Seghers Foundation or both.  Alternatively, if the Court were to assume that Tikar owned all or any part of the Seghers Collection or the African artifacts, Tikar failed to prove that its activities were in furtherance of an exempt purpose, namely charitable or educational.

**[*34]** A.    <u>Tikar served a private interest</u>.

An organization is not operated for an exempt purpose unless it serves a public rather than private interest.  <u>Redlands Surgical Servs. v. Commissioner</u>, 113 T.C. at 71-72.  Tikar served the private interest of Dr. Seghers or the Seghers Foundation.

Tikar has failed to prove that it owned the Seghers Collection or any other African artifacts.  Many of the African artifacts that Tikar asserts it owned were purchased and stored by Dr. Seghers.  Tikar presented two sets of unexecuted and undated documents purporting to show the sale of the Seghers Collection from Dr. Seghers to the Rivus Trust and then from the Rivus Trust to Tikar.

Further, Mr. Wohlmacher, the trustee for the Rivus Trust, stated that he did not know about the stated purchase price in the transfer documents.  He stated that the amount the Rivus Trust paid for art was approximately $800,000, but he did not provide any signed documents to verify the sale of the Seghers Collection to Tikar.

When asked about Mr. Wohlmacher's statements, Tikar explained that the Seghers Collection had been transferred to it by Dr. Seghers and should be characterized as a gift.  To explain the $25 million mortgage reported on Forms 990-PF, Tikar stated that Dr. Seghers and his father spent approximately $25

[*35] million acquiring the African artifacts and that Dr. Seghers was expecting "to get the money that he put in it" as a return. The administrative record does not prove that a gift of the African artifacts was made to Tikar, that ownership of the Seghers Collection or Dr. Seghers' African artifacts was transferred to Tikar, or that a mortgage was executed.

Tikar also submitted to the IRS a statement, signed by its three officers, that "[a]ll titles, ownership, copyrights, royalties or similar interest in articles, textbooks, and films or other materials acquired by Tikar, Inc. will be held by the organization for the purpose of promoting African Art by exhibits through the corporation itself or through museums". This statement does not mention the Seghers Collection or Dr. Seghers' African artifacts and, therefore, does not establish that Tikar had an ownership interest in the Seghers Collection or other African artifacts.

Additionally, Tikar agreed to give percentage interests in the Seghers Collection to private parties: 10% to AAG, 5% to Jim Linzy, Ltd., and 2.5% to Mr. Kormanik. The administrative record indicates that private parties owned part or all of the African artifacts or Seghers Collection. Therefore, any activities to authenticate the African artifacts or the Seghers Collection, or to increase their value, furthered private interests, not public interests.

[*36] The administrative record supports a finding that Dr. Seghers continued to own the Seghers Collection, the Seghers Foundation did not transfer ownership of the Seghers Collection to Tikar, and that Dr. Seghers controlled Tikar's funds and the use of its money for activities related to the assets he or the Seghers Foundation owned. Accordingly, Tikar's activities benefit the private interests of Dr. Seghers or the Seghers Foundation, and they did not serve a public interest.

B.     Tikar's activities did not further an exempt purpose.

Even if the Court were to assume that Tikar had an ownership interest in the Seghers Collection or other African artifacts, Tikar did not establish that it engaged in activities that furthered an exempt purpose.

1.     Tikar did not display the African artifacts.

Cultural organizations such as museums, symphony orchestras, ballet, opera, theater, or other similar organizations may qualify for tax-exempt status as educational and/or charitable organizations under section 501(c)(3) because they promote public appreciation of the arts, considered useful to the individual and beneficial to the community, as well as provide instruction and training to individuals for the purposes of improving or developing their capabilities. Sec. 1.501(c)(3)-1(d)(2) and (3), Income Tax Regs.; see Plumstead Theatre Soc'y, Inc. v. Commissioner, 74 T.C. 1324, 1329 (1980), aff'd, 675 F.2d 244 (9th Cir. 1982).

[*37] As stated in Tikar's application for exempt status and its articles of incorporation, Tikar was organized "[t]o present expositions of objects belonging to the corporation.  To negotiate contracts with Museums and other organizations to organize expositions.  To promote African Art by exhibits through the corporation itself or through museums.  To do any and all necessary and incidental to the stated purpose but in no * * * [way] in violation of Section 501(c)(3) of the Internal Revenue Code."

Tikar asserts it has displayed the African artifacts both nationally and internationally to educate people worldwide about the Tikar culture.  Specifically, Tikar states in the late 1990s, "the major art pieces" of the Seghers Collection were on display at the office of ABC and remained there until 2015.  Additionally, Tikar states that some African artifacts belonging to Dr. Seghers, and ultimately Tikar, were displayed in the National Museum of Yaoundé.  In January 2015, after more than five years of rehabilitation work, the National Museum of Yaoundé reopened and continued displaying Tikar's African artifacts.

a.     ABC and the Museum of Tikar Art

Information in the administrative record does not demonstrate that Tikar displayed the African artifacts in furtherance of an exempt purpose.  Dr. Seghers, not Tikar, entered into an agreement with ABC to display at least 100 pieces of the

[*38] Seghers Collection before Tikar was organized. The agreement was dated December 20, 1996, and signed by "B. Waine Kong, Esq.", chief executive officer for ABC and by Dr. Seghers as an art collector and allowed Dr. Seghers to sell any and all pieces in the Seghers Collection.

A Museum of Tikar Art was established at the office of ABC in 1996, three years before Tikar was established. However, Dr. Seghers and ABC were unable to secure further funding, and the Museum of Tikar Art appears to have ceased as a museum in 1998 or 1999. In the late 1990s most of the African artifacts displayed by ABC were sent to the warehouse in Temple, Texas, where Dr. Seghers stored the remaining Seghers Collection.

Tikar asserts that a few major pieces were left with ABC and were not returned to the warehouse until 2015. However, the administrative record does not prove this assertion. The unsubstantiated assertion does not establish an activity by Tikar that furthered one or more exempt purposes.

b.      National Museum of Yaoundé

Tikar has not established that items in the Seghers Collection were displayed at the National Museum of Yaoundé. In 2006 the African artifacts that Dr. Seghers had purchased and that were in the possession of Mr. Mbiam were transferred to the National Museum of Yaoundé and stored in the museum's

[*39] basement. The inventory report, created in September 2007, explained that the space provided for the collection was insufficient and the rooms were overcrowded which made visiting by tourists difficult. Tikar did not submit any other evidence explaining whether visitors of the National Museum of Yaoundé could access the basement where its African artifacts were stored.

Tikar argues that in January 2015 the National Museum of Yaoundé reopened and continued displaying Tikar's African artifacts. As evidence that its African artifacts were displayed, Tikar refers to an English translation of a newspaper article dated January 15, 2015, discussing the reopening of the National Museum of Yaoundé. However, this newspaper article does not mention Tikar or any of the African artifacts.

A second newspaper article included in the administrative record explains that the National Museum of Yaoundé opened with exhibits outdoors, on the first floor, and on the second floor. The exhibits outdoors included an "Exhibit of bronze statues representing the Tikar people". However, the article does not mention Tikar or the African artifacts that were stored in the basement. Tikar does not argue that it engaged in any activities related to the reopening of the National Museum of Yaoundé. Tikar did not prove that the African artifacts housed in the

[*40] National Museum of Yaoundé were displayed when the museum reopened in 2015.

### c. Attempts To Display African Artifacts

Tikar also argues that Dr. Seghers and Mr. Bradle both tried to set up exhibits to display the Seghers Collection. In a letter to Mr. Linzy, Dr. Seghers stated that he contacted ABC to get the few remaining African artifacts back so they could be displayed as part of a planned exposition at the Cameroon Embassy in Washington, D.C. However, Tikar did not substantiate the efforts made by Dr. Seghers to negotiate an exhibit at the Cameroon Embassy or to demonstrate that such an exhibit was held.

Additionally, in an email sent November 24, 2012, Mr. Bradle stated that he "would like to contact several major museums in Los Angeles, Chicago, New York, Washington DC[,] and Miami to put on an exhibit featuring Tikar and African bronze technology." Tikar did not substantiate the efforts Mr. Bradle made to contact these museums. These statements, without additional documentation, do not prove that Tikar engaged in activities in furtherance of an exempt purpose within the meaning of section 501(c)(3).

**[\*41]** 2. <u>Tikar did not purchase or authenticate the African artifacts in furtherance of an exempt purpose.</u>

Tikar argues that it is well documented that it had difficulty securing expositions at museums while it worked diligently to resolve disputes as to the "provenance" and "authenticity" of the African artifacts. Therefore, Tikar argues that it was operated exclusively for an exempt purpose because it attempted to purchase and authenticate additional African artifacts.

An organization may satisfy the operational test even if it operates for purposes that are different from the exempt purposes stated in its application for exemption so long as it operates exclusively for exempt purposes. Sec. 1.501(c)(3)-1(d)(1)(iv), Income Tax Regs.

Tikar states that over the years it spent hundreds of thousands of dollars attempting to authenticate its African artifacts. As support Tikar relies upon reported expenses on the Forms 990-PF, bank statements, emails from Mr. Ahmadou and Mr. Bradle, and shipping documents. However, the administrative record does not prove that any funds were used for furthering an exempt purpose.

Tikar reported archaeology fees of $50,000 for 2011, $150,000 for 2012, and $75,025 for 2013, and archaeology expedition expenses of $51,500 for 2011 and $30,000 for 2012. Yearend bank statements demonstrate that Tikar spent the

[*42] amounts it reported on its Forms 990-PF for 2011, 2012, and 2013 but do not explain what it spent them on. The bank statements show wire transfers to "Societe General" and "Citibank N.A." and a check in 2011 for $40,000 with a description of "Tepche Nsengou Ahmaobin". Mr. Ahmadou confirmed in an email that in 2012 he received a total of $150,000 and used that money to finance "multiple expeditions in * * * [his] area country to find [A]frican art objects, negotiated for * * * acquisitions through multiple intermediaries with old traditional chiefs and others like government officials to obtain the proper export permits". However, Mr. Ahmadou did not state for whom he purchased the African art objects.

The administrative record includes "shipping documents" showing that objects such as "handicrafts", "statues", and bronzes were shipped from Cameroon to Belgium. While these "shipping documents" appear to demonstrate that objects that may be African artifacts were shipped from Cameroon to Belgium, Tikar has not explained, and the administrative record does not show, whether the objects shipped were purchased on behalf of Tikar, why they were shipped to Belgium, and how the purchase and shipment of the African artifacts are activities that further one or more exempt purposes.

[*43] Tikar hired an archaeologist, Mr. Bradle, in 2005 to authenticate the African artifacts in the warehouse in Temple, Texas. Documents, mostly emails from Mr. Bradle, in the administrative record suggest that from 2005 to 2015, Mr. Bradle made three or four trips to Cameroon. In an email dated November 15, 2012, Mr. Bradle proposed two trips to Cameroon. Mr. Bradle described the first trip as the "administrative clean up on this project" and explained that he planned to finalize a rough inventory that is adequate for sale purposes of "the collection".

Mr. Bradle explained that on the second trip he planned to conduct field work and deliver samples to the appropriate metallurgy laboratories in London. His email included proposed budgets. However, his emails of proposed activities do not provide sufficient information as to whether these trips were conducted and what authentication activities were performed during these trips. Tikar did not provide information from laboratories in London, documentation from other experts working with samples, reports on research, or steps taken to authenticate the African artifacts in order to exhibit them in museums.

Additionally, the administrative record does not include any evidence to support Tikar's assertion that it was unable to display the African artifacts without authenticating them. Tikar stated that it is well documented that it had trouble securing expositions in museums because of disputes as to the provenance and

[*44] authenticity of the African artifacts, but it did not produce any documents where a museum questioned the authenticity of an African artifact or decided not to display it without authentication. If this was an issue, Tikar could have held its own exhibits to promote the African artifacts or found other organizations that would display them. In fact, in the 1990s, Dr. Seghers and ABC created the Museum of Tikar Art and did display some of the African artifacts for a brief period.

Tikar could also have engaged in other activities to promote the African artifacts or Tikar culture. In Goldsboro Art League, Inc. v. Commissioner, 75 T.C. 337 (1980), the Court determined that an organization that displayed a permanent collection of art, sponsored art classes and art demonstrations, and operated two public galleries exhibiting and selling artwork operated for exempt purposes. Additionally, in Cleveland Creative Arts Guild v. Commissioner, T.C. Memo. 1985-316, the Court determined that an organization's activities such as art demonstrations, slide programs, student art competitions, literary contests, and dramatic productions were directed toward the exempt purpose of promoting the arts and enhancing public appreciation of various art forms and that only an insubstantial part of the organization's activities served a nonexempt purpose.

[*45] Unlike these organizations, Tikar stored the African artifacts in a warehouse in Texas and in the basement of a museum in Cameroon. Tikar could have exhibited the African artifacts in other locations instead of storing them. Additionally, Tikar could have engaged in other activities to promote the African artifacts and enhance the public's appreciation of Tikar culture. Tikar did not engage in activities that furthered an educational or otherwise exempt purpose.

## Conclusion

The Court concludes that Tikar did not operate exclusively for one or more exempt purposes within the meaning of section 501(c)(3). Accordingly, Tikar has not met its burden of proving that respondent's determination to revoke its tax-exempt status effective January 1, 2012, was erroneous. The Court has considered all of the arguments made by the parties and, to the extent they are not addressed herein, the Court finds them to be moot, irrelevant, or without merit.

Decision will be entered for respondent.